[No. S014496. Dec. 4, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFREDO ALVARADO PADILLA, Defendant and Appellant.

902

**COUNSEL**

Bradley N. Webb, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Janet G. Bangle, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARABIAN, J.**—Not long after midnight on January 5, 1988, the body of Esther "Goosey" Alvarado, a homeless prostitute and heroin addict, was found lying facedown on the edge of a country road near Grayson, a small town in Stanislaus County about 15 miles west of Modesto, California. She

had shotgun and small-caliber bullet wounds in her chest and abdomen. Beside her body, scrawled in the wet ground beneath her muddy hand, was the word "Jesse."

By daybreak that same morning, Stanislaus County Sheriff's deputies had taken Jesse Hernandez into custody and charged him with Esther's murder. Esther's fingerprints were found on the passenger window of Hernandez's automobile, and its undercarriage was caked with mud similar to the kind found in the deep tire tracks at the murder scene. Expended shotgun casings, recently fired, were found in the front yard of Hernandez's house, and a box of .22-caliber ammunition and two expended .22-caliber shells were recovered on the floorboard of his Oldsmobile.

Within days, sheriff's deputies began to suspect that Brenda Prado and Alfredo Alvarado Padilla, Brenda's companion and the defendant here, had conspired with and solicited Hernandez to murder Esther Alvarado in exchange for small quantities of heroin and cocaine. The motive, the district attorney would later contend before a capital jury, was revenge on Esther for a drug rip-off—taking narcotics from defendant and Brenda without paying for them. In an information filed on September 23, 1988, defendant was charged with capital homicide: one count of first degree murder (Pen. Code, § 187), together with a special circumstance allegation that the killing was for financial gain (Pen. Code, § 190.2, subd. (a)(1)); and one count of conspiracy to commit murder, accompanied by a special circumstance allegation that defendant's coconspirator, Jesse Hernandez, had carried out the actual killing for financial gain and that defendant had aided and abetted Hernandez in the murder of Esther. (Pen. Code, § 190.2, (subd. (a)(1).) A third count charged defendant with solicitation of murder. (Pen. Code, § 653f, subd. (b).)

A

At trial, evidence supporting the prosecution's theory that defendant and Brenda Prado had conspired to have Hernandez murder Esther in revenge for a drug rip-off first appeared in the form of testimony of sheriff's deputies relating accounts by relatives and friends of defendant and Brenda of hostility and suspicion existing between the couple, on the one hand, and Esther and Irene Castillo, one of Brenda's daughters and a close friend of Esther's, for several months prior to Esther's murder. As proof of that animus—and a motive for the conspiracy with Hernandez—the prosecution presented the testimony of two detectives that Irene had told them defendant had shot her with a pistol a few months before Esther's murder; the bullet grazed the right side of her abdomen, leaving a small scar. The shooting, a

deputy testified Irene told him, had occurred following a violent argument between Brenda, defendant and Irene over the theft of drugs. (Irene disputed this account of the incident, insisting that the shooting had been accidental and had arisen out of a quarrel over the theft of a radio.)

Another detective related to the jury a conversation with an Arthur Padilla (no relation to defendant) substantiating the prosecution's theory of a revenge killing. Inspector Raul DeLeon, a detective with the Stanislaus County Sheriff's Department, testified to an encounter with Arthur Padilla in jail in September of 1988. In the ensuing conversation, DeLeon testified, Arthur Padilla described an incident that he said had occurred about a week before Esther Alvarado was murdered. Arthur and Esther, whom Arthur described as a "good friend," had just arrived at defendant's house when Esther was set upon by defendant and an unidentified woman. The two beat Esther until Brenda Prado came out of the house and intervened, telling Arthur Padilla to, in DeLeon's words, "get her [Esther] out of there or . . . she was going to be killed, or they were going to kill her."

The evidential keystone of the prosecution's case, however, was the testimony of Anthony Ybarra, a young heroin and cocaine user who lived in Grayson. Ybarra testified that he visited defendant's house around 10:30 on the evening of January 4, 1988, in an attempt to buy some heroin. Upon arriving, there was a brief argument outside with a John Alvarado (unrelated to Esther) over the theft of a lawnmower earlier in the evening. Because he was disliked by defendant and Brenda, who suspected he was a police informant and refused to sell him drugs without first strip-searching him, Ybarra relied on Dallas White, another member of defendant's household, to obtain heroin and cocaine for him from the others.

That January evening, while waiting for White to return from inside the house with some heroin, Ybarra watched across an open field as a tan Oldsmobile stopped in front of Guzman's Bar and Grill, some distance from the Lawson house. Ybarra saw a woman with long hair get out of the car and enter the bar; he also recognized the car as one frequently driven by Jesse Hernandez, his sister Lupe Porter, and her husband Bruce Porter. As the Oldsmobile pulled away, heading slowly for defendant's house, Ybarra concealed himself between a parked car and the garage, because, as he later testified, he did not know who might be in the car. Jesse Hernandez got out of the Oldsmobile and entered the house.

A few minutes later, Ybarra listened as Hernandez, Brenda Prado and defendant, carrying a drop light, walked out on the back porch, into the backyard and entered a small, dilapidated trailer. Ybarra slipped through an

opening in the fence surrounding the backyard and crept up alongside the trailer, hoping, he testified, to overhear where defendant and Brenda hid their stash of drugs so that he might return and steal it in safety. Inside, he saw the three sitting at a small fold-out table. Jesse Hernandez was talking; Ybarra gave the jury this account of what he overheard.

"[T]hat bitch Goosey" was waiting for him "out there," Hernandez told the other two. "This here is her 20. She wants a 20, a coke. I feel like ripping her off."

"What you should do is just knock the shit out of her and take her money away from her . . . ," Brenda replied. "Why, why help her out like that? She already ripped us off, you know."

"Man I feel like knocking the shit out of her," defendant put in, "just going over there and beating the shit out of her myself."

"You know what?" Hernandez responded, "I'll do it myself, man . . . why put yourself through all the trouble? Let me do it . . . ."

At this point in the conversation, according to Ybarra, Brenda Prado interjected: "Well, if you are going to kick her ass, why don't you have something for it . . . if you are really out to, if you are really planning on kicking her ass . . . we'll let you have an issue for yourself."

"Like how much?" Hernandez asked.

"I'll give you an issue, something . . . worth your hassle," Brenda answered.

"I wish I could do that myself . . . kicking her ass myself," defendant said.

"I'll do it," Hernandez continued. "You know, I'll do it . . . . And I'll make sure . . . I do something . . . righteous . . . . I'll make it righteous. I'll make sure I knock the shit out of her and make sure she learns her lesson."

Brenda Prado spoke next: "I'll tell you what . . . if you do something righteous . . . I'll let you have . . . some black [heroin] and white [cocaine] . . . . I'll go as far as giving you . . . a half a gram of black and, and if you really, if you knock the shit out of her the way I think you will do, . . . hell, I'll give you half a gram of black and a 16th of white. And . . . that is more than enough for a good ass beating."

Then, according to Ybarra's trial testimony, "Hernandez . . . comes up with this other little idea of his that he had. He says, 'I'll even go as far as blowing her ass away,' [and] Brenda says, she goes, 'You mean to tell me that you'll actually blow her ass away?' And he—Hernandez—says, 'Yeah, I'll do it.' "

Defendant then asked Hernandez, "How much are you planning on buying for all that? You know, we don't have that much to give."

"Hey, we're family now," Hernandez answered. "We're related. I am not planning on asking you for that much . . . Just give me something righteous. You know me. I'll do it. . . . You know me for a long time. You know what I am about. I do things. That's what—you know I do things."

"Okay, I'll tell you what," Brenda said. "I am going to take your word for it. I am going to give you . . . an issue, and I am going to pay you some right now and some later on, possibly in the morning, possibly tomorrow evening, but I will pay you off . . . some more . . . and if you want some money I can only afford so much more, but I can't pay you that much more than what . . . I think you are expecting."

"Well, I'll tell you what," Hernandez answered, "I would be satisfied with a gram of black and a good old issue of coke."

According to Ybarra, "Palone [defendant's nickname] was worried." "He says, 'Well . . . Brenda, you know, hey, if you are going to let him have all that, you know, we are not going to have hardly anything left over, or we are going to have enough just to make our own money back in and have to recoup and the connection . . . you know how hard it is to get ahold of. So . . . we are going to have a hard time.' "

Brenda "says, 'Don't worry, honey. I have your wake-up . . . . I got your wake-up. Don't worry about it.' "

Asked by the prosecutor if defendant said "anything about the suggestion of Hernandez to kill the girl?" Ybarra testified that "All he said, as I can recall . . . was . . . he just said, 'Goddamn, I hope you don't rip us off . . . . If . . . you need a piece . . . I have a piece I can loan you.' "

"Hey, that's all right," Hernandez replied. "I don't need any. I got—I have me a shotgun in my ride. . . . I have a sawed-off . . . . You know what? I want to try it out. I might as well try it out now since . . . I got something to do with it, I'll try it out right now."

"[D]id [defendant]," the prosecutor asked, "say anything agreeing or disagreeing with that idea—to kill the girl?"

"Oh, hell no." Ybarra testified. "He didn't disagree [about] anything whatsoever. He, as a matter of fact it was all about, you know, blow the bitch away."

"Who said that?" the prosecutor asked.

Defendant had said that, Ybarra replied. "And in another manner he said, 'You know what? I want [to] just get her over with . . . to hell with it, man. Just blow the bitch away. Get her over with, you know.'"

Ybarra saw Brenda reach into her bra, take out a chunk of heroin, cut off a piece and hand it to Hernandez. She followed that by measuring out a quantity of cocaine into a baggie and handing it to Hernandez.

Returning to the front yard of the house, Ybarra watched as Hernandez got into his Oldsmobile and drove down the road, returning to Guzman's Bar. Moments later, Ybarra saw a figure resembling Esther Alvarado leave the bar and get in the Oldsmobile, which immediately drove off. Soon afterward, Dallas White returned to the front yard from inside the house. He appeared "paranoid" and apologetic, telling Ybarra that no heroin was available. Fearing that sheriff's deputies wanted him for questioning in connection with the theft of the lawnmower from John Alvarado's house earlier in the day, Ybarra asked White to drive him home; White obliged.

Ybarra testified that he and White left defendant's house sometime after 11:30 p.m. On the way to Ybarra's, the two saw a sheriff's patrol car parked outside the Alvarado residence. Ybarra testified that he "ducked down" low in the passenger's seat, fearing that he might be wanted for questioning concerning the theft earlier in the evening of the Alvarados' lawnmower. He arrived home shortly before midnight, Ybarra testified; he was able to pinpoint the time because "the 'Benny Hill show' came on exactly at 12 o'clock."

Ybarra also testified regarding an encounter with Dallas White, Irene Castillo, Brenda Prado, Betty Lawson and Esther Alvarado on the street in Grayson near the Lawson house the preceding August. As Ybarra approached the group, he observed Irene writhing on the hood of an automobile, her hand on her stomach in evident pain. Ybarra heard Irene yell at Esther, accusing her of being responsible for defendant's having shot her.

In the fall of 1988, after defendant had been charged in connection with the murder of Esther Alvarado, police officers in Spencer, Oklahoma, where

Brenda Prado had moved with her children a few weeks after Esther's death, retrieved from an apartment rented by Valerie Castillo, another of Brenda's daughters, a sawed-off shotgun hidden in the springs of a sofabed on which Brenda had slept. Trial testimony by a ballistics expert indicated that it was "highly likely" that the shotgun was one of the weapons used in the murder. At defendant's trial, testimony by a sheriff's detective was admitted to the effect that Dallas White, a housemate of defendant's who was confined in jail with him for a time following defendant's arrest, had told the detective that defendant had told White that "Valerie gave up the shotgun." White himself testified to similar effect, although he could not recall defendant's exact words to him.

B

The defense contended that defendant had no involvement at all in the murder of Esther Alvarado; the night of the killing, he and Brenda had been miles away playing bingo in Ceres, California, and, later in the evening, visiting a relative in Modesto. They had returned to the house in Grayson they shared with Betty Lawson and Dallas White (also known as Randy or "Tumbleweed"), arriving between 11:30 p.m. and midnight, well after Anthony Ybarra, the only witness linking defendant and Brenda to the alleged conspiracy to murder Esther, had left. Defendant sought to demonstrate that Anthony Ybarra could not have overheard the alleged conversation in the trailer behind the Lawson house: the testimony of other witnesses established that defendant and Prado did not arrive home until sometime between 11:30 and midnight. Richard Heckathorn, a sheriff's deputy, testified that he arrived at the house belonging to John Alvarado at 9:20 p.m. (where his parked cruiser was observed by Ybarra as he rode home with Dallas White a little *after 11:30*, according to Ybarra) on the evening of January 4 as part of his investigation of the theft of a lawnmower from Mr. Alvarado earlier that day. He left the Alvarado residence "approximately an hour to an hour and a half" later, Heckathorn testified, or around 11 p.m.

In addition, Dallas White testified that he had never sold drugs to Anthony Ybarra; that Ybarra had left the Lawson house before Jesse Hernandez arrived there on the night of January 4; and that there was no drop light at the house long enough to reach from the house to the trailer, as Ybarra had testified. In her defense testimony, Betty Lawson denied any knowledge of the gunshot injury to Irene Castillo in July or August of 1987. She also denied having entered the backyard trailer on the night of January 4, or that, to her knowledge, defendant, Prado, or Hernandez had gone there that night. In fact, she testified, the trailer was "all tore up" inside; "you couldn't get into the trailer," she said. According to Lawson's testimony, Anthony Ybarra

had left the house at least an hour before defendant and Prado had arrived home late on the night of January 4.

According to the testimony of Michael Clements, one of the deputies who questioned defendant in the course of investigating Esther's killing on the morning of January 5, defendant said that he and Brenda had been in Ceres, a nearby town, playing bingo on the night of January 4, and had returned home between 11:30 p.m. and midnight. Defendant's former stepfather, Gabriel Ramos, Jr., testified that defendant and Prado had dropped by his house in Modesto about 10:15 on the evening of January 4; they had come from a bingo game, he testified, and stayed about 45 minutes. Modesto, the defense established, is approximately 15 minutes by car from the Lawson house in Grayson.

Last, during his cross-examination of Anthony Ybarra, defense counsel introduced evidence that Ybarra had a long record of criminal convictions and had received favorable treatment, in the view of the defense, in exchange for his testimony against defendant.

A jury found defendant guilty of first degree murder, conspiracy to commit murder, and solicitation of murder. It also found true the special-circumstance financial-gain allegations with respect to the first degree murder and conspiracy to commit murder counts and found the multiple arming enhancements to be true.

## C

At the penalty phase of defendant's trial, the prosecution presented testimony and other evidence of eight separate incidents of violent or criminal conduct by defendant over a period of seventeen years. These included the juvenile breaking and entering of a drive-in restaurant; an arrest for public drunkenness with his former stepfather culminating in an assault on the arresting officer at the county jail; a knife fight with his uncle, Jesse Alvarado, in which Alvarado was cut; the attempted armed robbery of a 7-Eleven convenience store in Long Beach culminating in an assault on two undercover police officers and several incidents of assault—one on a police officer, Don Watson, who had ordered Brenda Prado's car towed; one at a party on a neighbor, Damian Silva; another involving another neighbor, George Funk, resulting in the fracture of Funk's jaw in three places; and an incident in which Gilbert Bejaran, a twelve-year-old, was choked by defendant while visiting defendant's daughter in the family home.

Defendant's penalty phase defense began with an account of the circumstances of his early life. His parents separated when he was around eight

years old, and for a time he and his brothers and sisters lived with their mother, subsisting on welfare and what their father provided them. The children later lived with their father in a tough neighborhood in southern California and then in Modesto. At 15, defendant and a brother went to live with an uncle. Defendant appeared to flourish there, often going fishing with his uncle, attending truck driving school, competing in high school track and wrestling, and working in his uncle's plumbing business. Although defendant did not use drugs or alcohol during this period of his life, several family members had substance abuse problems. Evidence in the form of a report by defendant's former parole officer was introduced to show that defendant's stabbing of Jesse Alvarado in a 1973 knife fight was provoked by Alvarado; defendant acted in self-defense. Defendant's own testimony buttressed this account of the incident.

Brenda Prado also testified on defendant's behalf at the penalty phase. The two had met in 1976; she had four children by a prior marriage and she and defendant together had five children. Defendant was a good father to all of the children. Prado also testified that defendant had been drinking at the time of the Silva incident and that he had struck George Funk because Funk had hit Valerie, one of defendant's daughters. After defendant began to use cocaine and heroin in 1986, his addiction grew steadily. Eventually, Prado agreed to manage the drug sales in order to support defendant's habit and the children. Betty Lawson, Dallas White and Esther Alvarado were all heroin users and customers of Prado and defendant; Lawson and Esther both supported their drug habits by acts of prostitution, usually carried out in the trailer in the backyard of the Lawson house.

The 1987 incident in which defendant's stepdaughter Irene was shot occurred because of Irene's acts of prostitution in the Lawson trailer, Prado testified. Defendant found Irene's behavior disrespectful and the two had quarreled. When defendant went into the bedroom to retrieve a revolver so the other children would not find it, Irene followed him. They struggled; Irene grabbed the gun and told defendant she was going to kill him. As they fought over the it, the pistol discharged, grazing Irene. Irene was not shot because defendant and Prado believed she had stolen heroin from them.

Although Prado had sold drugs to Jesse Hernandez in the past, the last sale had occurred two days *before* Esther was murdered. Prado had known Anthony Ybarra since 1987 but always refused to sell drugs to him, knowing that he was a police informant. For that reason, Ybarra had told Prado twice in 1987 that he would get even with her if she did not sell heroin directly to him. Not long before Esther's murder, Prado testified, defendant had overdosed on cocaine. Frightened by that experience, he determined to kick his

habit and take better care of the children. Although he tried to overcome his addiction several times, he always sickened and began to use drugs again. He had made an appointment with a methadone clinic for the morning of January 5, 1988, but failed to keep it when the police arrived at his house as part of their investigation of Esther's murder.

Defendant gave the following penalty phase testimony: The juvenile breaking-and-entering arrest at the M & M Drive-In was the result of a prank; defendant was the class clown and, wanting to pretend to take the food orders of his friends, climbed through an open window. He was given probation but violated it by continuing to drink. As a result, he was sent to Sierra Conservation Camp; there he earned a high school diploma. Following his release, defendant enrolled in college but began drinking and chasing women and dropped out. It was about this time that the fight with his uncle, Jesse Alvarado, occurred. That incident was provoked by Alvarado, who had been drinking and pulled a pocket knife on defendant.

The incident at the 7-Eleven store in Long Beach occurred after defendant had been drinking. He had entered the store to buy cigarettes but left when he realized that he had no money. The undercover officers had jumped him as he left; he did not reach for the gun he was carrying and did not attempt to shoot them. He did not say the things attributed to him in the officers' testimony; they beat him up twice, once at the scene and later at the jail. The Silva incident also did not occur as Mr. Silva testified. Defendant had gone to the Silvas' to find Prado and had gotten into an argument with Mrs. Silva when Mr. Silva poked defendant with an empty flower pot and told him to leave. Defendant struck Silva two or three times before being threatened with a kitchen knife. The choking incident involving Gilbert Bejaran occurred when Gilbert and his friends refused to leave the Lawson house after being told to go by defendant; defendant had lifted Gilbert up by his collar and later apologized.

Defendant met Brenda Prado after being released from prison for violating parole in 1976. They lived together as husband and wife. He first became addicted to heroin in 1986; when Prado found out about it, she was angry and tried to persuade him to stop. When he could not, she agreed to take charge of his drug dealing activities, although she did not like it. After an accidental cocaine overdose in 1987, defendant decided to give up drugs. Although he tried several times, he was unsuccessful. He had made an appointment at a methadone clinic for July 5, the morning Esther's body was found; under the circumstances, he failed to keep the appointment.

Defendant gave Esther drugs on occasion, but never fronted drugs to her; nor did Esther ever steal any drugs from him or from Prado. He never struck

Esther. Irene was never shot by defendant. The two did struggle for possession of a pistol in his waistband, but she made up the story about having been shot. He did not know who had murdered Esther and did not hire anyone to kill her.

Several correctional and parole officers testified on defendant's behalf. The gist of their testimony was that defendant had been a good inmate who conformed to the rules and was respectful of the staff. Defendant's early hostility had disappeared and his attitude appeared to have improved. Morris, his parole officer in 1977, testified that defendant was an exceptional parolee who appeared to be free of alcohol and drug use. Other law enforcement officers who had recent contact with defendant described him as conforming, quiet and cooperative, and not a problem. Defendant's niece, stepson and stepdaughter all testified that they regarded defendant as their father and hoped to visit him in prison.

Following its deliberations, the penalty jury set defendant's sentence at death. Like defendant, Jesse Hernandez was separately charged with capital homicide, tried, convicted, and also sentenced to death for his part in the murder of Esther Alvarado. (*People* v. *Hernandez* (S020244, app. pending).) Defendant's appeal to this court is automatic. We now affirm.

## I. Guilt Phase Issues

1. *Sua sponte duty to instruct on lesser included offenses of first degree murder.*

Defendant contends the trial court committed error by failing, on its own initiative, to instruct the jury on the elements of second degree murder, manslaughter, and battery, as lesser included offenses of first degree murder. Underlying this claim is the argument that the jury might have concluded, on the basis of Anthony Ybarra's testimony, that defendant's "drug and alcohol induced blitherings encouraged the murder . . . but that his degree of culpability was less than first degree murder." In other words, defendant argues that he was so mentally impaired by drug use at the time of the conversation in the trailer that he was unable to form the intent required for first degree murder.

The People, relying on our holding in *People* v. *Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588], that in the aftermath of the 1981 legislative abolition of the diminished capacity defense, a defendant must *request* a so-called "pinpoint" instruction on the lesser included offenses of first degree murder, argue that the trial court had no duty to so instruct in

this case absent such a request by the defense. This shift in responsibility from the trial judge to the defendant is said to follow from the fact that, as we stated in *Saille*, with the abolition of the diminished capacity defense, " 'when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a "pinpoint" instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such "pinpoint" instructions are not required to be given *sua sponte* and must be given only upon request . . . .' " (*Id.* at p. 1117.)

Defendant's challenge to the trial court's failure to give the jury a lesser included offense instruction with respect to the charge of first degree murder, however, is broader than the issue of so-called "pinpoint" instructions. His claim is that had such a lesser included instruction been given, the jury, having heard evidence of defendant's chronic drug abuse, might have concluded that he lacked the mental state required for first degree murder. The argument misapprehends the theory of defendant's liability for first degree murder on which the case was framed by the information and tried.

Defendant was charged in the information with conspiring, soliciting, and aiding and abetting Hernandez in the murder of Esther Alvarado; his criminal liability, if any, was thus derivative, for it depended on *Hernandez's* state of mind. The jury was so instructed by the trial court, who told them that they could find defendant guilty of first degree murder only if they found that "the killing was preceded and accompanied by a clear, deliberate intent on the part of *Jesse Hernandez to kill*, which was the result of deliberation and premeditation . . . ." (Italics added.)

"The requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense. Also like a conspirator, he is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets." (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; see also *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318]; *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961].)

 Relying on language in *People* v. *Woods* (1992) 8 Cal.App.4th 1570 [11 Cal.Rptr.2d 231], defendant contends that the trial court had a sua sponte duty to instruct on lesser included offenses of first degree murder because, as he argues in his brief, "the fact that the perpetrator of the crime is guilty of one crime does not mean that the person who aids and abets the perpetrator is necessarily guilty of that degree of the crime." The record, however, suggests no factual basis for such a conclusion *in this case.* The evidence showed indisputably that the object of the conspirators' discussion in the trailer on the night of January 4 was the *premeditated murder* of Esther Alvarado, not the commission of a lesser offense. Because the evidence before the jury was such that defendant, as an "aider and abettor, if guilty at all, [was] guilty of something *beyond* [a] lesser offense" of first degree murder, the trial court was not required to instruct on *lesser* offenses of first degree murder. (*People* v. *Woods, supra,* 8 Cal.App.4th at p. 1593, italics added.)[1]

## 2. *Failure to instruct the jury regarding defendant's oral admissions.*

 At trial the prosecution introduced testimony to the effect that, while in jail awaiting trial, defendant had told Dallas White, then a jailmate of defendant, that a sawed-off shotgun had been recovered from Valerie's house by police officers, referring to the sawed-off shotgun hidden in the couch or daybed on which Brenda slept in Valerie Castillo's Oklahoma house. Because, as he notes, the prosecution "argued the admission extensively to the jury," defendant contends that the trial court's failure to read the jury CALJIC No. 2.70—to the effect that extrajudicial statements of a defendant short of a confession "should be viewed with caution"—was not only error, but prejudicial. We conclude that any error in failing to give the instruction was not prejudicial under the circumstances of this case.

We evaluate a claim of prejudicial failure to give such a cautionary instruction under the *Watson* standard. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) As we formulated the test in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], where we held that the trial court must give such an instruction sua sponte, "[t]he omission [i.e., of an oral admissions cautionary instruction] does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably

---

[1]Whether the trial court has a sua sponte duty to instruct on lesser included offenses of aider and abettor liability under circumstances in which "the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence" (*People* v. *Woods, supra,* 8 Cal.App.4th at p. 1593) is a question pending before us in *People* v. *Prettyman* (S040008, app. pending). We need not and do not resolve it in this case.

probable that a result more favorable to defendant would have been reached in the absence of the error. [Citations.]" (*Id.* at p. 455.) "The purpose of the cautionary instruction," we explained, "is to assist the jury in determining if the statement was in fact made. [Citations.]" (*Id.* at p. 456; see also *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 93-94 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1224-1225 [249 Cal.Rptr. 71, 756 P.2d 795].)

Defendant argues that the absence of such an instruction must have been prejudicial because the testimony came in through a detective—Fontes—rather than through a friend of defendant, there was a dispute as to "about the exact words used, their meaning [and] whether the admissions were reported accurately" (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1268 [278 Cal.Rptr. 640, 805 P.2d 899]), and there was evidence "that the statement was not made . . . or was inaccurately remembered or reported." (*People* v. *Stankewitz, supra,* 51 Cal.3d at p. 94.)

The argument overplays the record. The prosecution originally called Dallas White to relate defendant's purported statement to him while in jail. On the stand, White admitted that defendant had told him that the shotgun "was found in some girl's house." Pressed by the prosecution, White testified that defendant had told him that the shotgun had been found in "Valerie's house. That's what he said." White, however, thought that Valerie had been living in California, not Oklahoma, and testified that the words "gave up" the shotgun "might have been the words I used" in later retailing defendant's account to Detective Fontes. He denied, however, that those were the words that *defendant* had used when speaking to him in jail; in fact, White testified, he could not remember what defendant had said to him that caused him, White, to say to Fontes that Brenda's daughter "gave up" the shotgun.

Detective Fontes was then called by the prosecution to testify as to what White had told him defendant had said about the recovery of the shotgun. "I asked him how he knew about a sawed-off shotgun . . . . [and h]e said that he had talked to [defendant] at the jail and [defendant] had told him Brenda's daughter gave up the shotgun back in Oklahoma," Inspector Fontes testified. "Is that a quotation from Mr. White?" the prosecutor asked. "That's as near as I can recall it as a quotation, yes," Fontes answered.

Thus it is clear from this account that the value of the disputed testimony does not turn on whether defendant used the words "gave up" or used some other word to describe the recovery of a shotgun at Valerie's house; it is the *fact* of the recovery of such a weapon that was critical, and as to that event

there really was no dispute that defendant had in fact made such a statement: White testified that defendant had told him that a sawed-off shotgun had been found by police at Valerie's house; Fontes confirmed that account, embellishing it with the phrase "gave up." The purported inaccuracies, such as they were, go not to the *fact* of the statement by defendant to White, but to details (where Valerie lived at the time, whether she "gave it up") that were immaterial. In light of these circumstances, as well as the comparatively marginal role defendant's statement must have played in the totality of the record, we conclude that any error in failing to read to the jury CALJIC No. 2.70 was not prejudicial.

### 3. *Admission of evidence that defendant shot his stepdaughter.*

■ At trial, the prosecution offered, and the court admitted into evidence, testimony of Irene Castillo, another of defendant's stepdaughters, that defendant had placed a handgun next to her abdomen in the course of an argument and pulled the trigger, inflicting a flesh wound. Defendant argues that the admission of this evidence—offered by the prosecution under Evidence Code section 1101, subdivision (b), to show a "prior bad act" by defendant—was erroneous because the record fails to show affirmatively that the trial court balanced the potential prejudice of the evidence against its probative value, a weighing required as a condition of admission by section 352 of the Evidence Code. (See, e.g., *People* v. *Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757] ["Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' "].)

The testimony of Castillo was admitted by the trial court only after briefing by both sides and lengthy argument by counsel out of the presence of the jury. The prosecution's position was that defendant's placing a pistol against Irene's abdomen several months before Esther's death and pulling the trigger, together with evidence that defendant and an unidentified female had beaten up Esther (accompanied by statements by Brenda Prado that defendant would "kill her") a week or so prior to the murder and the circumstances surrounding those events, constituted powerful evidence of defendant's motive to conspire with Brenda and Hernandez to have Esther killed—that is, revenge on Esther for having taken drugs from defendant and Brenda without paying for them.

The prosecution insists that a close examination of the record demonstrates *by implication* that the trial court was aware of—and therefore must have balanced—the probative value of the testimony against the risk of undue prejudice to defendant. It points to the fact that the prosecution's

pretrial brief explicitly discussed the Evidence Code section 352 issue, as well as defense arguments at the sidebar that the admission of the challenged evidence would be highly prejudicial, as demonstrating that, because the issue of probative value versus undue prejudice was *before* the trial court, ergo it must have conducted such an evaluation.

Our cases make it clear that, although the record must affirmatively show that the trial court weighed prejudice against probative value in admitting evidence of prior bad acts (see, e.g., *People* v. *Wright* (1985) 39 Cal.3d 576, 582 [217 Cal.Rptr. 212, 703 P.2d 1106], *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468]), the trial judge "need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation.]." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84]; *People* v. *Crittenden* (1994) 9 Cal.4th 83, 135 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Thus, as the cases reflect, we are willing to infer an implicit weighing by the trial court on the basis of record indications well short of an express statement. Several of the cases to which we have been cited involved argument of counsel or comments by the trial court, or both, touching on the issues of prejudice and probative value from which we might infer that the court was aware of the Evidence Code section 352 issue and thus of its duty to weigh probative value against prejudice. (See, e.g., *People* v. *Garceau* (1993) 6 Cal.4th 140, 179 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Clair* (1992) 2 Cal.4th 629, 660-661 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1016-1017 [254 Cal.Rptr. 586, 766 P.2d 1]; *People* v. *Montiel* (1985) 39 Cal.3d 910 [218 Cal.Rptr. 572, 705 P.2d 1248].)

Those guideposts are sufficiently present in the record in this case. We have read the transcript of the oral argument of counsel respecting the admissibility of testimony of defendant's shooting of Irene Castillo and the comments of the trial judge in reaching his ruling. The prosecution stated in its pretrial brief that an Evidence Code section 352 weighing was required as a condition of admitting the evidence and, although not the strongest of reeds, defense counsel in his oral argument on the point took the position that what he referred to as the "extreme prejudice" likely to follow on the admission of such evidence should bar its use. This use of the talismanic word "prejudice," together with the prosecution's discussion of the weighing process in its pretrial brief on the point, are a sufficient assurance under our reasoning in *People* v. *Montiel, supra,* 39 Cal.3d 910, to signal that counsel and the trial court had in mind the appropriate analytic framework for passing on the admissibility of the evidence, that the court was therefore aware of the need to weigh the evidence under section 352, and thus that it must have done so.

The scantiness of the transcript makes the issue a close one, however, and were we to conclude that the record indications are insufficient, we are nevertheless satisfied that, assuming the trial court did *not* evaluate the evidence under Evidence Code section 352, *had* he done so he would have admitted it in any event. Our review of the trial transcript indicates that the prosecution sought to introduce testimony relating to defendant's shooting of his stepdaughter as evidence of a motivation common to both that incident and in later hiring Jesse Hernandez to murder Esther Alvarado. Trial testimony tended to establish that Prado and defendant were both convinced that Irene and Esther had together stolen drugs from them. Accordingly, evidence that defendant had shot Irene, together with testimony indicating that he had done so in retaliation for the theft of drugs, would have been a linchpin in the prosecution's theory of the motive behind the conspiracy to have Esther murdered—that is, revenge.

Defendant argues that the evidence should not have been admitted because it had virtually no probative value. As defense counsel argued before the trial court, defendant's motive in shooting Irene had nothing whatever to do with drugs but with the theft of a radio and was, in any event, an accident. That account, however, was one of two conflicting versions offered by the prosecution and defense to explain the incident. So long as the prosecution's evidence was relevant to the issues before the jury, that is, had any tendency in reason to prove or disprove a disputed fact in issue (Evid. Code, § 210), it was admissible. Thus, on the probative side of the equation, the challenged evidence offered considerable support to the prosecution's theory of the case.

With respect to the other side of the Evidence Code section 352 balance sheet—the question of prejudice—defendant argues that the evidence was incendiary because of the risk that the jury would be irrationally inflamed on learning that defendant had shot his own stepdaughter over an issue involving drugs. The governing test, however, evaluates the risk of *"undue"* prejudice, that is, " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,' " not the prejudice "that naturally flows from relevant, highly probative evidence." (*People* v. *Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189], quoting *People* v. *Yu* (1983) 143 Cal.App.3d 358, 377 [191 Cal.Rptr. 859]; see also *People* v. *Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199].)

We conclude, therefore, that if in fact the trial court failed to balance the factors of prejudice and probative value of the evidence as required by Evidence Code section 352, the error was not prejudicial to defendant's interests.

### 4. *Alleged Marsden error in denying defendant an opportunity to relate specific instances of trial counsel's asserted incompetence.*

 Approximately three weeks *after* the penalty phase of defendant's trial had concluded with the jury's verdict of death, defendant wrote the trial judge the following note: "Your Honor: [¶] I Alfredo Alvarado Padilla the defendant don't feel that I was competently or adequately represented by counsel Fred Cannat [*sic*]. And I ask that a retrial be granted to me for the following reasons: That my counsel did not subpena witnesses for my defense which I had asked for. These witnesses would have impeached Anthony Ybarra and proved me innocent. Defense counsel did not cross-examine two prosecution witnesses, Irene Castillo and Arthur David Padilla whos[e] testimony[] was incriminating against me. I also ask that the court take into consideration a piece of evidence which was entered into evidence by the defense at my penalty trial. That can set a time frame that Mr. Ybarra was given a ride home on his admittion [*sic*] in testimony that night. I feel that defense counsel should have had entered this piece of evidence at my guilt trial for impeach [*sic*] of [M]r. Ybarra. It is for these reasons and the incompetence of my attorney that I ask for this retrial. [¶] Thank you! Alfredo A. Padilla."

The following week, at the time set for entry of judgment and pronouncement of sentence, defense counsel stated in open court that he had discussed with defendant a continuance of the sentencing proceeding in order to "file some papers in regard to the Court's ruling on the mandatory motion for a new trial." Defendant agreed to waive the time for sentencing, which was put over for two weeks. The following exchange then occurred:

"THE COURT: I have received a letter from the Defendant requesting some consideration about adequacy of counsel, and so forth, but I don't know whether that's—You wish to pursue that at this point or not?

"DEFENDANT: No, Your Honor.

"THE COURT: No?

"DEFENDANT: No.

"THE COURT: Okay. Very well. The defendant is remanded to the custody of the sheriff."

Two weeks after that colloquy, defendant's attorney filed with the court a memorandum arguing for a sentence of life without parole instead of death.

A hearing on the automatic motion to modify the verdict was held, argument was heard, and the motion was denied. Throughout all of this, nothing was said by defendant, his attorney, or the trial judge about defendant's note requesting a retrial on the ground that his attorney had been incompetent.

It is on the basis of this record that defendant now argues that the trial court erred in not granting him a so-called *"Marsden* hearing" at which he would have an opportunity to present evidence as to the manner in which counsel's legal representation was ineffective. (See *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) It is true we held in *Marsden* that "a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney." (*Id.* at p. 124.) But that is not what occurred here.

While defendant's note to the court vaguely charged his trial attorney with failing to introduce exculpatory material, it did not ask that counsel be removed or that new counsel be appointed; nor did it necessarily suggest that a fundamental breakdown had occurred in the attorney-client relationship. ▮ "[A] trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises when the defendant in some manner moves to discharge his current counsel. [Fn. omitted.] The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing. [¶] There is no constitutional right to an attorney who would conduct the defense of the case in accord with the whims of an indigent defendant. [Citations.] Nor does a disagreement between defendant and appointed counsel concerning trial tactics necessarily compel the appointment of another attorney. [Citations.]" (*People* v. *Lucky* (1988) 45 Cal.3d 259, 281-282 [247 Cal.Rptr. 1, 753 P.2d 1052].)

▮ Defendant's note seems, rather, to have been a request for a new trial based on his lawyer's ineffective representation at trial. Whether viewed as a request for a new trial, or even for substitute counsel, or for both, however, the request was clearly abandoned, for the record demonstrates that defendant affirmatively withdrew the request made in his note in the course of the later colloquy in open court and never again raised it.

5. *Failure to advise defendant of his right to a second attorney and to appoint a second attorney.*

▮ Defendant contends that his court-appointed trial counsel devoted an inadequate amount of time to the preparation of his defense, a failing, he

argues, that was so manifest from counsel's fee requests filed with the trial court, that the trial court fell under a sua sponte duty to advise defendant of his right to the appointment of a second attorney as cocounsel. He relies on Penal Code section 1095 as the source of the court's duty to advise him that he could be represented by a second counsel.

Penal Code section 1095 merely provides that two counsel "may *argue* the cause" (italics added) in a capital case, and that in any other case, the court has discretion to restrict argument to a single attorney.[2] As we said in *People v. Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], " 'The right guaranteed by . . . section [1095] is applicable only to a defendant who *has retained* more than one attorney as counsel in the case. It does not give the defendant in a capital case the right to have more than one counsel appointed to represent him, but merely allows a defendant who has retained multiple counsel the right to have at least two of them argue the case.' " (*Id.* at p. 286, quoting *People* v. *Natale* (1962) 199 Cal.App.2d 153, 157 [18 Cal.Rptr. 491], italics added.)

Another statute, Penal Code section 987, subdivision (d), *does* provide for the appointment of a second attorney to represent the defendant in a capital case. It confers discretion on the trial court to "appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed" and provides for the presentation of an affidavit setting forth the reasons in support of the request.

It is evident from the text of Penal Code section 987, subdivision (d), that it is appointed *trial counsel*, rather than the capital defendant himself, who needs to know the circumstances under which a second attorney may be appointed and the mechanics of seeking the appointment. Indeed, under the statute, the trial court lacks any specific authority to appoint a second attorney in the absence of a request from the first attorney and the making of a factual record sufficient to support such an appointment. To the extent that defendant's argument is that the trial courts have inherent power to appoint a second attorney, no authority supporting that proposition is cited.

We need not decide that question in light of this record, however, because neither the nature of the charge nor of the defense suggests that the case presented dimensions requiring the appointment of a second attorney. It is true that appointed counsel's wife died between the guilt and penalty phases of the trial, but counsel had an assistant throughout and never indicated to

---

[2]The full text of the statute reads as follows: "If the offense charged is punishable with death, two counsel on each side may argue the cause. In any other case the court may, in its discretion, restrict the argument to one counsel on each side." (Pen. Code, § 1095.)

the trial judge that he required additional help. Defendant himself never expressed dissatisfaction with his attorney until after the guilt and penalty phases of his trial had concluded. In any event, defendant's claim that the trial court should have been alerted to the need for second counsel by the deficiencies in counsel's performance as manifested by the fee requests is belied by the record. At least two of counsel's four fee requests (and perhaps more—the signatures on two of them are illegible) were reviewed by judges of the court *other* than the one who presided at defendant's trial. The trial judge thus had no reasonable means of evaluating trial counsel's performance other than what he observed of it in court. Our review of the record does not disclose that counsel's performance was such that the trial court should have been alerted to consider appointing a second attorney, assuming it possessed such authority.

6. *Prosecutorial misconduct in failing to correct Anthony Ybarra's perjurious testimony.*

■ Defendant points to five discrepancies in Anthony Ybarra's testimony, all relating to sentences received or dispositions made in connection with Ybarra's prior theft convictions. He contends that the prosecution had a duty to and failed to correct this allegedly perjurious testimony, thus violating his due process interests. (See, e.g., *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218-219, 83 S.Ct. 1194]; *Giglio* v. *United States* (1972) 405 U.S. 150, 154 [31 L.Ed.2d 104, 108-109, 92 S.Ct. 763] [*Brady* disclosure requirements apply to evidence relating to witness credibility].) For the most part, an examination of Ybarra's testimony reveals that there was no failure to disclose to the jury an accurate account of his conviction and sentencing history during the course of his examination and cross-examination. In those few instances where minor inaccuracies crept into the record, no error of constitutional dimension occurred because the inaccuracies in the witness's testimony were not material errors "in the sense that [their] suppression undermines confidence in the outcome of the trial." (*United States* v. *Bagley* (1985) 473 U.S. 667, 678 [87 L.Ed.2d 481, 491, 105 S.Ct. 3375]; *In re Sassounian* (1995) 9 Cal.4th 535, 543-544 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

First, defendant asserts that Ybarra lied when he testified that he served 10 days of a 15-day sentence for a petty theft conviction; in point of fact, defendant asserts, Ybarra's entire 30-day sentence was suspended, he received 12 months' unsupervised probation, and he served no time. The record shows, however, that Ybarra received partial credit for a $300 fine in that matter in the form of credit for time served and that, after Ybarra testified at defendant's trial, a bench warrant issued for his arrest in connection with the failure to pay the balance of the fine still owing. Thus, Ybarra

did serve *some* time for that offense and may have served more, depending on the disposition of the bench warrant, a matter not disclosed by the record. We find nothing in the account of this incident that could be construed as misconduct.

Second, defendant asserts that Ybarra lied when he testified that another municipal court case was dismissed when he "went through drug diversion." In fact, defendant asserts, a charge of being under the influence of a controlled substance which carried a mandatory 90-day jail sentence was dismissed and, although he was ordered to enroll in the diversion program, he failed ever to do so, without consequence. Defense counsel, however, *did* elicit from the witness an admission that he had been able to *avoid* serving 90 days in jail by virtue of a plea in the case. That admission, of course, was the point of defense counsel's examination of Ybarra on this matter and he effectively made it.

Third, defendant contends that Ybarra lied when he stated, in response to the prosecutor's question, "have you ever been convicted of a felony as a felony," that "as a felony . . . I was convicted of grand theft." In fact, defendant asserts, Ybarra was permitted to plead to misdemeanor grand theft, and a related felony charge (petty theft with prior) was dismissed as part of a plea bargain. The jury was thus misled, defendant implies, by remaining unaware that the felony charge was reduced to a misdemeanor. The record discloses that three separate theft cases (involving aluminum siding, a screwdriver set, and some spark plugs[3]) were consolidated for a negotiated disposition on September 2, 1988. Under the terms of the plea agreement, Ybarra agreed to enter a plea of guilty to misdemeanor grand theft on the charge involving the aluminum siding, and guilty to petty theft with a prior—a felony—on the charge involving the spark plugs.

In exchange, the prosecution agreed to recommend jail time (120 days), probation and restitution in the siding case, probation and an 8-month concurrent jail term on the spark plug charge, to recommend that Ybarra be confined outside Stanislaus County because of his status as a witness in defendant's case, and to recommend dismissal of the case involving the theft of the screwdrivers. Ybarra's pleas under the agreement were duly taken and the case involving the theft of the spark plugs, a felony, was certified to the superior court for sentencing. On December 27, 1988, the record discloses, the superior court sentenced Ybarra to three years' probation and ordered him to serve two hundred forty days in jail and pay a fine of $250.

As noted, defendant complains that in testifying, Ybarra misrepresented to the jury the disposition of the aluminum siding case as involving a felony.

---

[3]The theft charge involving the screwdriver set also involved an additional count of possession of a syringe and hypodermic needle.

But Ybarra's answer to the prosecution's question whether he had ever been convicted of a felony "as a felony" was accurate: he responded that "[a]s a felony I've been convicted of—I was convicted of a grand theft. And then after that I was convicted of a petty theft with a prior, which was a felony." We see nothing here to suggest that the witness misrepresented his criminal history before the jury or that the prosecution attempted to hide anything. In any event, as the prosecution notes, defense counsel's cross-examination of Chief Deputy District Attorney Berrett gave the jury a full account of the details of the negotiated disposition of the three theft matters.

Defendant also complains that Ybarra lied to the jury by failing to disclose the prosecution's agreement to recommend that he be confined in a jail outside of Stanislaus County and faults the prosecution for failing to disclose that fact to the jury. It is true that the witness did not mention that fact in his testimony. However, it was brought out by defense counsel in his examination of Ms. Berrett, who stated that, as part of the bargain, the prosecution agreed to "actively seek" Ybarra's placement in a facility outside the county.

Last, defendant complains that Ybarra lied to the jury by misstating the terms of the plea disposition, testifying that a felony charge had been . dismissed because he pled guilty to "three other petty thefts with a prior which were felonies." In fact, as defendant notes, Ybarra pled guilty to a single count of petty theft with a prior. As noted, Ms. Berrett's testimony under cross-examination by defense counsel laid out the entire matter for the jury's understanding; although Ybarra seemed at times to have been confused over the details of his tortured criminal history, the jury could not have failed to grasp the gist of it—the witness was a habitual thief and chronically in the coils of the criminal justice system.[4]

Defendant relies chiefly on a decision from the United States Court of Appeals for the Second Circuit, *United States* v. *Seijo* (2d Cir. 1975) 514 F.2d 1357, for the proposition that perjury by a key prosecution witness regarding his prior convictions is prejudicial as a matter of law and reversible error. We find *Seijo* easily distinguished from this case on its facts. Unlike the witness there, whose prior drug trafficking conviction was suppressed and not disclosed to the jury, Ybarra was not portrayed before the

---

[4]As a measure of Ybarra's confusion over sentencing details, he had this to say in response to defense counsel's questions regarding the disposition of the case involving the screwdrivers.

Defense counsel: "Three other petty thefts with a prior as felonies were dismissed?
Ybarra: "No, they weren't—no, they weren't, sir.
Defense counsel: "They were disposed of?
Ybarra: "They weren't disposed of either.
Defense counsel: "Are they still pending?
Ybarra: "They are not pending. I got sentenced on it."

jury as the young and innocent victim of senior criminal associates whose credibility was superior to that of the veteran conspirators against whom his inculpatory testimony was offered. His very introduction to the jury was heralded by the prosecution's admission that he was a drug addict, a thief, and a police informant. "Anthony Ybarra," the prosecutor told the jury in his opening statement, "will tell you . . . that he's an ex-felon . . . . that he's been a thief; that he has stolen before to support his drug habit . . . you are going to hear . . . about thefts and rip-offs that were involved in either the taking of drugs or the taking of property to buy drugs."

And far from being an "innocent kid" like the witness in *United States* v. *Seijo, supra,* 514 F.2d 1357, Ybarra himself admitted in his testimony to a laundry list of prior convictions and a chronic criminal lifestyle that could have left no doubt in the mind of any reasonable juror concerning the witness's likely truthfulness and integrity. The few omissions, such as they were, from the roster of Ybarra's prior convictions that were allowed to creep into the record were thus cumulative of other, more powerful evidence of the witness's crime-ridden past that *was* before the jury. On this record, we have no doubt that the minor omissions were not the sort that violated defendant's due process interests.

7. *Improper imputation of financial gain motive to defendant as a result of erroneous instructions.*

■ Defendant's contention under this, the first of three claims of error in instructing the jury as to the financial gain special circumstance (see Pen. Code, § 190.2, subd. (a)(1)), is that the instruction given was flawed because it improperly permitted the financial gain motive of Jesse Hernandez to be imputed to defendant. That is, defendant argues that the instruction given the jury failed to require that it make an individual determination that defendant's individual motive "be to provide financial gain to induce the murder." The argument is based on a flawed premise.

Construing the financial gain special circumstance added by the 1978 initiative, in *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723] we adopted a limiting construction of the provision "under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*Id.* at p. 751.) But as we went on to point out in *Bigelow,* "[u]nder the 1978 law, [the *hirer* of a paid killer] is not directly subject to the special circumstance unless he was motivated by financial gain, but is subject to a special circumstance finding as one 'found guilty of intentionally aiding, abetting, counseling,

commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder . . . in any case in which . . . the special circumstance enumerated in paragraphs (1) . . . [is] specially found . . . to be true.' (§ 190.2 subd. (b).)" (*Id.* at p. 750, fn. 11.)

This is so because, at the time of Esther Alvarado's murder, subdivision (b) of Penal Code section 190.2 provided that "[e]very person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or [life without parole] in any case in which . . . the special circumstance[] enumerated in paragraph[] (1) . . . of subdivision (a) of this section has been charged and specially found . . . to be true." Thus, by the terms of the statute, "one who intentionally aids or encourages a person in the deliberate killing of another for the killer's own financial gain is subject to the special circumstance punishment." (*People* v. *Freeman* (1987) 193 Cal.App.3d 337, 339 [238 Cal.Rptr. 257].)

The result is a sensible one. The likelihood that one who hires another to kill the victim is motivated by a desire to enrich *the killer* is remote; the hirer is far more likely to have motives of his own, motives which are not necessarily pecuniary. Thus, when a person commits murder for hire, the one who did the hiring is guilty of the financial gain special circumstance only as an *accomplice.* (See, e.g., *People* v. *Bigelow*, *supra*, 37 Cal.3d at p. 750, fn. 11 [construing the 1978 law].) Moreover, in this case, before defendant could be found subject to the financial gain special circumstance as an accomplice, the jury was required to find that defendant had the intent to kill. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1142 [240 Cal.Rptr. 585, 742 P.2d 1306] [". . . section 190.2(b) lays down a special rule for a certain class of first degree murderers: if the defendant is guilty as an aider and abetter, he must be proved to have acted with intent to kill before any special circumstance (with the exception of a prior murder conviction) can be found true."].) There was thus no error in the trial court's instructions on this score.

8. *Insufficiency of the evidence to sustain a finding of the financial gain special circumstance.*

Linked to defendant's claim of instructional error with respect to the financial gain special circumstance is the related claim that the evidence failed to establish that Esther Alvarado was murdered for financial gain. He relies on several dictionary definitions in support of the proposition that the receipt by Hernandez of drugs in exchange for his agreement to murder

Esther does not fall within the meaning of the word "financial." Alternatively, he contends that the special circumstance should not be applied, except where the monetary value of the thing exchanged is "substantial."

Almost from its inception as part of the 1978 Briggs Initiative, we have construed the financial gain special circumstance to be at least as broad as, if not broader than, the predecessor 1977 provision. In *People* v. *Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279], we contrasted the somewhat limiting language of the predecessor financial-gain special-circumstances statute (which required that the killing be " 'carried out pursuant to agreement [by the killer] to accept a valuable consideration for the act of murder . . . .' ") with the current, 1978-enacted version, before concluding that "[t]he phrase is not a technical one . . . . [T]he statutory language . . . indicates that it was intended to cover a broad range of situations." (*Id.* at pp. 408, 410.)

Given our conclusion that the current version was not intended by the voters to reduce the scope of the preceding "valuable consideration" version of the financial gain special circumstance provision, defendant's argument collapses. Here, as in *People* v. *Howard, supra,* 44 Cal.3d 375, and *People* v. *Noguera* (1992) 4 Cal.4th 599 [15 Cal.Rptr.2d 400, 842 P.2d 1160], there was no need for further refinement or restrictive interpretation of the financial gain special circumstance. We add only that, as a matter of both penal policy and practical concern, it makes little difference whether the coin of the bargain is money or something else of value: the vice of the agreement is the same, the calculated hiring of another to commit premeditated murder.

For related reasons, defendant's contention that we should gloss the financial-gain special-circumstance provision to require the exchange of "objects of substantial monetary value" also fails. Apart from relying on a dictionary definition of "financial," defendant cites no authority supporting such a proposition. Again, we see little moral distinction between hiring a contract killer for, say, $10,000, and hiring a drug user who agrees to do the same work for $200 worth of heroin and cocaine. Indeed, as the prosecution points out, given Hernandez's dependence on narcotics, defendant and Prado were able to achieve their aim of eliminating Esther at a bargain rate. That is hardly a persuasive reason for holding that the financial gain special circumstance should not apply to defendant and we decline to do so.

9. *Erroneous "financial gain" special circumstance jury instructions under the facts of this case.*

Defendant's final assault on the financial gain special circumstance is the argument that, under the facts of this case, the trial court erred in not

specially instructing the jury on the elements of financial gain. Defendant recognizes that in several cases we have held that no instruction is required beyond a reading of the language of the statute itself. (See, e.g., *People* v. *Howard, supra,* 44 Cal.3d 375; *People* v. *Noguera, supra,* 4 Cal.4th 599; *People* v. *Edelbacher, supra,* 47 Cal.3d 983.) He contends, however, that under the "unique" facts of this case, where only small quantities of drugs were passed from Brenda Prado to Hernandez and were "used to satisfy a physical craving," the purported gain was not a *financial* one. As explained above, however, because we reject defendant's argument that the financial gain special circumstance should turn on the monetary value of the thing exchanged, we must likewise reject this claim, dependent as it is on the antecedent argument.

## II. Denial of Effective Assistance of Counsel

A substantial part of defendant's brief in support of reversal is devoted to multiple claims that his counsel provided constitutionally ineffective assistance at both the guilt and penalty phases of the trial. Before addressing these points in turn, we summarize briefly the legal standard under which Sixth Amendment claims of ineffective assistance are evaluated.

The touchstone for evaluating such claims remains that enunciated by the United States Supreme Court in *Strickland* v. *Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*). The right of a defendant in a criminal proceeding to counsel " 'is the right to the effective assistance of counsel.' " (*Id.* at p. 686 [80 L.Ed.2d at p. 692], quoting *McMann* v. *Richardson* (1970) 397 U.S. 759, 771, fn. 14 [25 L.Ed.2d 763, 773, 90 S.Ct. 1441].) In implementing that right, the high court has said that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (466 U.S. at p. 686 [80 L.Ed.2d at pp. 692-693].) "[C]ounsel is strongly presumed to have rendered adequate assistance," the *Strickland* court wrote, "and made all significant decisions in the exercise of reasonable professional judgment." (466 U.S. at p. 690 [80 L.Ed.2d at p. 695].)

The inquiry has two components. As we recently summarized the standard under which such claims are evaluated, "a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination

more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails. Moreover, ' "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." [Citation.]' " (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1126 [36 Cal.Rptr.2d 235, 885 P.2d 1], italics in original.)

Hindsight is "highly deferential." (*Strickland, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at pp. 694-695].) "In evaluating defendant's showing we accord great deference to the tactical decisions of trial counsel in order to avoid 'second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel to "defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . . ." ' " (*In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862].) Finally, to succeed, the defendant " 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Id.* at p. 1070, quoting *Strickland, supra,* 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698].)

1. *Claims of ineffective assistance of counsel at the guilt phase.*

a. *Failure to object to testimony regarding a prior inconsistent statement of Arthur Padilla.*

As noted, in the course of presenting its case, the prosecution called Arthur Padilla, purportedly to testify concerning an incident in which defendant had beaten up Esther Alvarado only a week or so before her death. However, Padilla, a prison inmate, failed to respond directly to any questions beyond his name, the fact that he had been convicted of burglary, was incarcerated, had once "driven through" the town of Grayson, and had known "Goosey" Alvarado. Beyond these bare facts, Padilla was unforthcoming, to put it mildly, often asserting a near total failure of memory.

The prosecution then called Raul DeLeon, a detective with the Stanislaus County Sheriff's Department. DeLeon testified to an encounter with Arthur Padilla in jail in September of 1988. In the ensuing conversation, DeLeon testified, Padilla told him that he was facing nine years in prison on multiple burglary charges and had information relevant to the Alvarado murder inquiry which he wanted to pass on. He then described an incident that occurred about a week before Esther Alvarado was murdered in which he

and Esther, whom Padilla described as a "good friend," had arrived at defendant's house only to have Esther set upon by defendant and an unidentified woman. The two beat Esther until Brenda Prado came out of the house and interceded, telling Arthur Padilla to, in DeLeon's words, "get her [Esther] out of there or . . . she was going to be killed, or they were going to kill her." Defense counsel raised no objection to DeLeon's testimony, an omission that defendant now attacks as constituting constitutionally ineffective representation.

As indicated, however, prior to Detective DeLeon's testimony and out of the presence of the jury, both counsel and the trial judge discussed at length the admissibility of DeLeon's testimony as relating a prior inconsistent statement of Arthur Padilla. Defense counsel objected vigorously to the admission of such testimony before being overruled. Given that the defense had already attempted, unsuccessfully, to prevent the introduction of DeLeon's testimony, it would have been futile for him to once again lodge an objection. Defense counsel was thus not ineffective on this score.

 b. *Failure to move to exclude or limit use of evidence that the murder weapon was found in the possession of Brenda Prado, defendant's coconspirator.*

 ■ At the guilt phase of defendant's trial, the prosecution called as a witness Valerie Castillo, one of Brenda Prado's daughters. She told the jury that several months after Esther's death, she had moved, together with her mother and several other children, from Grayson to Spencer, Oklahoma. While sharing a house in Spencer with Valerie, Brenda had slept on a fold-out couch. In October of 1988, Valerie had found, hidden in the springs of the couch, a sawed-off shotgun which she turned over to Spencer police officers. At trial, the gun was admitted into evidence, along with the opinion of a ballistics expert to the effect that the results of a test firing of the weapon matched the characteristics of the bullet that caused the wound in Esther Alvarado's chest.

It is on the basis of this evidence and testimony that defendant argues that trial counsel's failure to seek the exclusion or limit the use of the murder weapon amounted to incompetent representation. He relies on what he asserts is the proposition that, although the acts and statements of one conspirator in furtherance of the object of the conspiracy are admissible against all members of the conspiracy, acts or statements made *after* the object of the conspiracy has been achieved are not subject to the rule of cross-admissibility, citing *People* v. *Leach* (1975) 15 Cal.3d 419, 432-442 [124 Cal.Rptr. 752, 541 P.2d 296] and *People* v. *Saling* (1972) 7 Cal.3d 844,

852-853 [103 Cal.Rptr. 698, 500 P.2d 610]. These cases, however, deal with the well-known coconspirator exception to the hearsay rule embodied in Evidence Code section 1223; they do not impose any limitation on the cross-admissibility of *acts* by a coconspirator.

Valerie's testimony allowed the jury to infer, defendant argues, Brenda's conduct in hiding the shotgun well after the object of the conspiracy—the murder of Esther—had been accomplished. By permitting, without objection, the shotgun to be introduced into evidence, along with Valerie's testimony regarding the circumstances of its discovery, defense counsel abetted a breach of the rule against cross-admissibility of coconspirator acts or statements once the conspiracy had terminated.

Defense counsel was not ineffective in not seeking a limitation on the admissibility of the shotgun or of Valerie's related testimony. At the outset, it is worth noting that defense counsel successfully moved prior to trial for an order excluding any statements by Prado concerning the murder weapon precisely on the ground that such admissions would be outside the scope of Evidence Code section 1223 and thus inadmissible hearsay. The admission of the shotgun (and of Valerie Castillo's testimony recounting the circumstances surrounding its discovery) was just that—the introduction of an item of physical evidence which was obviously relevant to the prosecution's case, especially so in light of Anthony Ybarra's testimony detailing the conspiracy between defendant, Brenda Prado, and Jesse Hernandez to murder Esther Alvarado, and the testimony of a police ballistics expert that the shotgun was the murder weapon. Its admission into evidence did not violate the rule against the cross-admissibility of *statements* of coconspirators after the object of their agreement has been accomplished. The shotgun was admitted into evidence as the murder weapon itself, vouched for by the testimony of a ballistics expert as the gun that likely fired the bullet that killed Esther Alvarado.

It is not unlikely—indeed it is highly probable—that the jury inferred from the evidence surrounding the recovery of the shotgun that Brenda Prado had hidden it there; certainly the prosecutor's closing remarks invited such a conclusion. But the bar on the cross-admissibility of a coconspirator's statements made after the conspiracy has terminated does not bar the admission of a murder weapon found in the possession of one of the conspirators under circumstances that link it to the defendant. The admission of the shotgun, together with Valerie Castillo's testimony as to the circumstances of its discovery, thus did not run afoul of the rule against the cross-admissibility of a coconspirator's statements. The prosecutor's comments in his closing argument, regarding the strength of any inferences that might be

drawn as they bore on the government's theory of the case, were just that—comments on the evidence, and nothing more. Defense counsel was not ineffective in not moving to exclude the shotgun or not seeking a limiting instruction regarding its admissibility.[5]

c. *Failure to object to comments by the prosecutor and to associated instances of alleged prosecutorial misconduct in the guilt phase.*

Several of defendant's claims of ineffective representation by trial counsel at both the guilt and penalty phases of his trial are tethered to underlying claims of misconduct on the part of the prosecutor at trial. He contends, in other words, that the failure of defense counsel to interpose objections to multiple instances of prosecutorial misconduct amounted to constitutionally ineffective representation. Before considering these claims as they relate to the guilt phase in detail, we summarize the law relating to prosecutorial misconduct and the standard under which such claims are judged.

We recently reviewed the principles governing findings of prosecutorial misconduct in *People* v. *Gionis, supra,* 9 Cal.4th 1196, an opinion which itself canvassed recent decisions of this court on the subject. (*Id.* at pp. 1214-1219.) There we noted that, in order to make out a federal constitutional violation based on the conduct of the prosecution, a defendant must establish that the challenged conduct " 'comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." . . .' " (*Id.* at p. 1214, quoting *People* v. *Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619]; see also *People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610] [". . . a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury. . . . But the defendant need not show that the prosecutor acted in bad faith or with appreciation for the wrongfulness of the conduct, nor is a claim of prosecutorial misconduct defeated by a showing of the prosecutor's subjective good faith."].) As the federal high court has framed the controlling standard, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden* v. *Wainwright* (1985) 477 U.S. 168, 181 [91 L.Ed.2d 144, 157, 106 S.Ct. 2464], quoting *Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 642 [40 L.Ed.2d 431, 436, 94 S.Ct. 1868].)

---

[5]In point of fact, defense counsel did move timely to exclude the shotgun, on the ground that there was no evidence linking it to Brenda or connecting it to the shot that killed Esther. He also interrupted the prosecutor's closing argument on the same point, objecting that "there isn't any evidence that Brenda took the shotgun anywhere. The evidence is that it was found in Oklahoma in a bed." The trial court overruled the objection as to admissiblity and ruled that the prosecutor could "draw that inference," i.e., that because the gun was found in the coils of the bed on which Brenda slept, she must have put it there.

Moreover, "conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law *only* if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204], quoting *People* v. *Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d 776].) Finally, of course, even where the prosecutor's statements amount to misconduct, defense counsel may have sound tactical reasons for not objecting. "The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." (*People* v. *Frierson* (1991) 53 Cal.3d 730, 749 [280 Cal.Rptr. 440, 808 P.2d 1197].) Defense counsel's latitude must be especially broad where, as in this case, he labors under the demands of laying the groundwork for the coming penalty phase of the trial. (See, e.g., *People* v. *Cox* (1991) 53 Cal.3d 618, 660-662 [280 Cal.Rptr. 692, 809 P.2d 351].)

(1) *Prosecutor's misrepresentation of the evidence.*

 Defendant contends that in his closing guilt phase argument to the jury, the prosecutor misrepresented the evidence in six specific instances. Having compared the prosecutor's comments on the evidence with the testimony itself, we conclude that none of defendant's six claims has merit. While the prosecutor might have misstated the facts in one or two particulars, the discrepancies were minor and can be put down to faulty recollection of details in the midst of lengthy closing arguments at trial; none amounted to misconduct.

First, defendant contends that the prosecutor argued facts not in evidence when he told the jury, in an effort to convince them that Anthony Ybarra had not been given favors in exchange for his testimony against defendant, that Ybarra was "doing a several months' stretch in the county jail for stealing some hand tools worth a few bucks because the guy had committed a couple of prior petty thefts." In point of fact, as the county's chief deputy district attorney testified, at the time of trial Ybarra was incarcerated for the theft of some *spark plugs*, valued at $69, and not for the theft of a *screwdriver*, worth between $10 and $30, a charge that was dismissed at the time of sentencing and the one that the prosecutor evidently (and mistakenly) had in mind in his argument to the jury. The misstatement was no more than a simple mistake, did not amount to misconduct, and could only have had a de minimis effect on defendant's interests.

Next, defendant argues that the prosecutor wrongly argued to the jury that Ybarra's trial testimony was consistent with his statements to the police and

at the preliminary hearing. Defendant argues that Ybarra's preliminary hearing testimony was not introduced into evidence and, on that basis, charges the prosecutor with arguing facts not in evidence. But the prosecutor's remarks were not that Ybarra's testimony dovetailed with his testimony at the preliminary hearing. Rather, he said to the jury that ". . . the decision comes down to what do you know about the facts of this case, about who tells you and what matches up with what, and do you believe Anthony Ybarra told you the truth as verified by all these other facts or that he completely fabricated this story for some stupid, nonexistent motive and consistently stuck with it and somehow magically had it match all the other evidence in the case all the way through?" This was nothing more, in our view, than a fair comment on the state of the evidence given at the trial and the prosecution's view that Ybarra's testimony was consistent with other elements of the state's case. There was no misconduct on this count.

Defendant's next claim is that the prosecutor misrepresented the testimony of Lupe Porter, Jesse Hernandez's sister, concerning the ownership of a "rifle" Porter had borrowed. Defendant contends that Porter's testimony was that Brenda Prado owned the weapon, while the prosecutor, in his closing argument, attributed the ownership to defendant ("We know from Lupe [Porter] that she borrowed some type of a gun from Brenda Prado and/or [defendant] sometime earlier . . . ."). The transcript of Lupe Porter's testimony, however, is to the effect that the gun was owned *jointly* by defendant and Prado. She referred in her testimony to the "owners" of the gun and to asking "them" to take it back. The prosecutor's reliance on Porter's testimony, made in the course of rebutting the defendant's claim that he did not own a shotgun, was an inference fairly supported by her testimony. It was not misconduct.

Defendant's fourth claim of misconduct is that the prosecutor's closing guilt phase argument presented a distorted account of defendant's role in the critical conversation between himself, Prado and Hernandez at which the decision was taken to murder Esther Alvarado, a conversation that was obviously the linchpin of the state's case. It was the latter two, defendant insists, who took the lead in planning Esther's execution, while he was chiefly concerned with beating up Esther and, secondarily, husbanding his heroin stash. Ybarra's testimony, however, belies this version of events. While the prosecutor was factually wrong in asserting to the jury that it was defendant's idea to have Esther murdered *in the first instance* (the idea originated with Hernandez, Ybarra testified), the blunder is morally insignificant in the overall context of the conversation Ybarra swore he overheard. Both men wanted Esther beaten up; they argued over who should do the deed. And the fact that the murder originated with Hernandez pales in the

light of defendant's expressed desire to, in Ybarra's words, "just blow the bitch away." Moreover, defendant took an active role in the negotiations over price, being the first to ask Hernandez "just how much [dope he was] planning on buying," by using Esther's killing as the medium of exchange. Though technically incorrect in attributing the idea of Esther's murder as originating with defendant, there is nothing to suggest that the prosecutor's misstatement was intentional.

Defendant's fifth claim of misconduct revolves around the prosecutor's assertion that one of the motives for Esther's murder was the fact that she was a police informant as well as a thief. Although there was evidence that Esther had recently worked for the sheriff's office in exchange for the dismissal of petty criminal charges, there was no evidence, defendant asserts, that he or Prado or Hernandez, for that matter, had any knowledge of such activities; they could not, therefore, have been a motive for her murder. We agree that the prosecutor may have stretched the evidence in this instance. He asserted to the jury that part of the motive behind Esther's murder was to "get rid of a rat, an informant, whose reputation as an informant was out on the street." And, indeed, a member of the Patterson Police Department testified that Esther had made controlled buys of narcotics and that, several weeks before her death, he had learned from someone "outside of law enforcement" that Esther was known as a police informant.

Still, we doubt that there was enough here to support the prosecutor's argument to the jury that Esther was killed because the trio of conspirators knew she was a "rat." Even though the People argue that it can be *inferred* under the circumstances that defendant and Prado had reason to be concerned that Esther might snitch on them, we doubt the testimony sustains such an inference. That conclusion, of course, does not end the inquiry. Defendant's precise claim is that defense counsel was constitutionally ineffective in failing to object to the prosecutor's assertion of a link between Esther's activities as an informant and her murder. As we have noted on countless occasions, the decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one; under the circumstances here, we are unwilling to second-guess defense counsel's apparent decision not to object. It may well have been that counsel forebore raising an objection in order to avoid the possibility of underlining for the jury the evident fact that the trio *did* believe Esther was a *thief,* even if—contrary to the claim of the prosecutor—they did not know she was a "snitch."

Finally, defendant argues that the prosecutor misrepresented the evidence surrounding the timing of events on the night of Esther's murder. Specifically, he argues that, judging from the testimony at trial, Anthony Ybarra

*could not* have overheard the conversation in the trailer to which he testified. He anchors this assertion chiefly on the testimony of Deputy Sheriff Richard Heckathorn who said that he arrived at John Alvarado's residence on the night of January 4 at approximately 9:20. If, as defendant asserts, Heckathorn left Alvarado's house at precisely 10:30 that evening, then that would put Ybarra's departure from the Lawson house at approximately the same time, a conclusion that is inconsistent with the testimony of Gabriel Ramos (whom defendant and Prado visited that evening) that they arrived around 10:10 p.m. and left 45 minutes later, or around 11 p.m.

In point of fact, however, Heckathorn testified on cross-examination that he was at the Alvarado house for "an hour to an hour and a half" and "left there between 10:30 and 11:00." Given that concession, the prosecutor's assertion that Heckathorn left at approximately 11 p.m. was not untrue and supports his later assertion to the jury that the time differences at issue were, at most, "trivial." The case is similar with respect to the prosecutor's assertion that Ramos testified that defendant and Prado left his house at "10:10." In fact, Ramos said they left around 10:15, but we do not find the difference of five minutes one that amounts to misconduct or, by parity of reasoning, that defense counsel's failure to object amounted to ineffective assistance.

 (2) *Improper accusations that defendant and associates were threatening witnesses.*

 Defendant cites what he calls repeated instances in which, he alleges, the prosecutor suggested to the jury that witnesses for the prosecution had been or were being threatened by defendant or his associates. In none of these instances, defendant argues, was there any evidence of record to corroborate the prosecutor's insinuations. In his examination of Lorenzo Guzman, for example, the bar owner who testified as to the hour at which Esther Alvarado left his bar and grill the night of the murder, the prosecutor asked Guzman whether the fact that he still lived in Grayson didn't make "the fact of having to testify in these proceedings make you uncomfortable, given that fact?"

Similarly, in explaining to the jury Arthur Padilla's reluctance to testify, the prosecutor asserted that "[h]e doesn't want to tell you anything but his name, rank and serial number. He's part of the brigade, the code of silence. If he tells, he's a rat, a snitch, an informant . . . ." And in his treatment of Anthony Ybarra's testimony, the prosecutor asserted to the jury that Ybarra was "subject[ed] to a lot of pressure in this little community of dope users, sellers, and killers, to not . . . come forward" and testify. Last, defendant

argues that the prosecutor accused Dallas White of lying under oath because he feared what defendant and others "inside the house" would do to him if they found out that "he had Anthony [Ybarra] out there, a snitch, buying dope."

In none of these instances, however, did the prosecutor's remarks carry him into misconduct. Guzman's testimony was at times diffident and the prosecutor elicited an admission that, still living in Grayson, the witness was "uncomfortable" testifying, "given that fact." In his closing argument, the prosecutor relied on this concession, characterizing Guzman as "afraid, a little bit concerned about being here testifying against them." But this is far from accusing defendant or his associates of threatening Guzman if he testified. The witness kept a bar in the neighborhood and might naturally have been concerned lest his account of events the night of the murder suggest that he was indiscreet. The challenged remarks were fair comment on the behavior of a witness. (See, e.g., *People* v. *Green, supra,* 27 Cal.3d at p. 20.)

Likewise, the prosecutor's remarks concerning Arthur Padilla's reluctance to testify was linked to the fact that he was a prison inmate at the time he was called as a witness. No suggestion was made that defendant or his allies had threatened the witness. The case is similar with respect to Anthony Ybarra, there being no implication in the prosecutor's remarks that the witness had been threatened by defendant or anyone associated with him.

Finally, defendant's treatment of the prosecutor's comments regarding Dallas White's testimony relies on an out-of-context interpretation of their significance. The prosecutor's argument to the jury on this score was directed at discrediting White's testimony as to the timing of his and Ybarra's departure from the Lawson residence. The prosecutor sought to undermine White's recollection of leaving earlier than Ybarra had testified by noting that his housemates would have been upset knowing that he was dealing narcotics to a known informant. He had, therefore, as the prosecutor told the jury, "a motive from the word go to say [Ybarra] was long gone before [Hernandez] got there."

Because, in none of these instances, did the prosecutor's remarks transgress the limits of legitimate argument, defense counsel had no basis for making an objection. His failure to do so, therefore, did not constitute ineffective representation.

(3) *Inflammatory remarks designed to appeal to jury prejudice.*

According to defendant, throughout the trial, from his opening guilt phase statement to his closing penalty argument, the prosecutor showcased

for the jury the government's overriding theory of the case—that defendant and Prado had put out a contract on Esther Alvarado because she had taken narcotics without paying for them and they needed to make an example of her. These efforts, and the overriding theme, defendant argues, amounted to an impermissible attempt to try defendant for capital homicide based on his character as a drug dealer.

We reject the suggestion that the prosecutor did anything more than provide the jury with a motive for defendant's conduct, and one that was amply supported by the evidence—that being in the business of dealing illegal drugs, defendant and Prado had no means of punishing those who ripped them off except self-help, in this case, making an example of Esther Alvarado by having her shot and her body left by the roadside. It is true that the record is replete with comments by the prosecutor to the effect that "dope dealer[s] . . . leave a body out by the roadside," and that "the only way a dope dealer can [avenge a rip-off] . . . is to do it on the street with violence." It would, of course, have been blinking reality not to bring before the jury the enduring theme of the evidence the state put before them: defendant, Prado, Hernandez, White, and the others *were* "dopers," who lived in a milieu in which heroin and cocaine were the coin of the realm and in which, or so the evidence fairly suggests, those who steal narcotics are subject to a violent and personal retaliation. We do not find in this, as defendant urges us to do, an improper appeal to a free-floating "passion and prejudice" unrelated to the evidence before the jury that a prosecutor is forbidden to make. (See, e.g., *People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1250.) That being the case, defense counsel was not ineffective for not having objected in the instances cited by defendant.

### (4) *Impermissible comments on witness credibility.*

 Defendant also faults trial counsel for his alleged failure to object to the prosecutor's "personalization of credibility" of witnesses, his repeated belittling of defense counsel, and his supposed vouching for the truth of Anthony Ybarra's testimony. In connection with the first of these three charges, defendant claims that the prosecutor's repeated use of the personal pronoun "I" in his closing guilt phase argument amounted to "a personalization of the fact finding process," and that he improperly vouched for the credibility of a ballistics expert.

Of course, a prosecutor is free to give his opinion on the state of the evidence, and in arguing his case to the jury, has wide latitude to comment on both its quality and the credibility of witnesses. (See, e.g., *People* v. *Green, supra,* 27 Cal.3d at p. 35, fn. 20; *People* v. *Heishman* (1988) 45

Cal.3d 147, 195 [246 Cal.Rptr. 673, 753 P.2d 629].) It is misconduct, however, to suggest to the jury in arguing the veracity of a witness that the prosecutor has information undisclosed to the trier of fact bearing on the issue of credibility, veracity, or guilt. The danger in such remarks is that the jury will believe that inculpatory evidence, known only to the prosecution, has been withheld from them. (See, e.g., *People* v. *Green, supra,* 27 Cal.3d at p. 35; *People* v. *Heishman, supra,* 45 Cal.3d at p. 195; *People* v. *Frierson, supra,* 53 Cal.3d 730, 748.) But that is not what occurred in this case. Rather than vouching for the credibility of witnesses on grounds not revealed to the jury, the prosecutor here simply drew inferences as to credibility on the basis of evidence presented to the jury; this he was entitled to do, and no basis for a defense objection appears.

Nor did the prosecutor engage in misconduct warranting reversal by vouching for the credibility of Michael White, the prosecution's ballistics expert. Responding to a suggestion of defense counsel that White had "made up" his conclusion that the bullet taken from Esther Alvarado's body had been fired from the sawed-off shotgun found in the couch on which Brenda Prado had slept, the prosecutor insisted in his closing argument that, had he lied, White would have "risked his whole career of 17 years." Defendant contends that this remark was improper, relying on *United States* v. *Martinez* (6th Cir. 1992) 981 F.2d 867, for that conclusion. It is true that in *Martinez* the United States Court of Appeals for the Sixth Circuit held a closely similar argument by a prosecutor (asking the jury why a state police officer would "risk his career, 18 years in the state police, to come in here and lie . . . .") to be improper. Although we doubt that the argument was proper, we find no reasonable probability that defendant was prejudiced by the prosecutor's argument in this case.

Defendant also faults the prosecutor for allegedly improperly belittling defense counsel, citing seven examples. We have reviewed each of these instances in the trial transcript and conclude that in none was the prosecutor slandering counsel, impugning his integrity, or otherwise engaging in misconduct.

Last, defendant contends that trial counsel was negligent in failing to object to the prosecutor's allegedly improper examination of a police investigator, Sergeant Michael Clements, in the course of which, defendant contends, the prosecutor allegedly elicited "improper opinion testimony that the critical prosecution witness [Anthony Ybarra] was telling the truth." Defendant relies on our opinion in *People* v. *Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741], a pre-Proposition 8 case prohibiting opinion testimony as to a witness's truthfulness, whether from an expert or a

lay witness. Even assuming the *Melton* rule applies to this case, it was not violated here.

Clements was one of the investigators of Esther Alvarado's murder. In the course of cross-examining him, defense counsel asked about Anthony Ybarra's reputation in Grayson for truthfulness; Clements replied that Ybarra had a reputation for being untruthful. On redirect, the prosecutor asked whether members of the community of Grayson who had a low opinion of Ybarra's truthfulness were themselves honest and Clements said that in his opinion they were not. On further recross-examination, defense counsel asked Clements whether Ybarra had a reputation among law enforcement officers in the county for truthfulness. Clements answered "yes and no," and explained that although he often lied on first being questioned, after being confronted "time and time again . . . he will eventually give you the truth."

The prosecution continued this line of questioning on further redirect, asking Clements the basis for his conclusion that Ybarra initially lied but eventually told the truth. Clements replied in substance that he measured Ybarra's statements against certain "knowns" (as he called them), meaning he judged Ybarra's truthfulness by the extent to which he was able to corroborate his statements. It is this statement concerning "knowns," which defendant asserts were facts not disclosed in evidence, that forms the basis for the claim the prosecution elicited opinion testimony, as to veracity, condemned in *People* v. *Melton, supra,* 44 Cal.3d 714.

By this account of the matter, however, it is plain that the prosecution's questions and Clements's replies were not of the sort considered in *People* v. *Melton, supra,* 44 Cal.3d. 714. Clements never gave the jury his opinion as to whether Ybarra was truthful in his account of the conversation between defendant, Prado and Hernandez on the night of January 4, largely because of a timely and successful objection by defense counsel. Instead, he was asked about and commented upon Ybarra's character for truthfulness, citing, in the one instance now challenged by defendant, generalized instances in which statements made by Ybarra had been corroborated.

(5) *Comment on witness's exercise of privilege against self-incrimination.*

Defendant's next claim of ineffective assistance based on trial counsel's failure to object to instances of alleged prosecutorial misconduct at the guilt phase concerns a comment made regarding Betty Lawson's invocation of her Fifth Amendment right not to answer a question as to whether she sold heroin. In his closing argument to the jury, the prosecutor made note of this

fact. Defendant correctly points out that it is improper for the prosecution to comment not only on the failure of the defendant to testify on his own behalf, but also with respect to any witness's exercise of a privilege not to testify. (See Evid. Code, § 913, subd. (a).) Yet, as defendant also notes in his brief, there was "no 'tactical basis' for counsel's failure to object other than that, by objecting, counsel would have drawn attention to" defendant's failure to testify. In short, defendant's argument is self-refuting.

> d. *Failure to adequately challenge Anthony Ybarra's testimony on cross-examination.*

██ Although defendant's brief divides the argument on this score into two parts—defense counsel's ineffective inquiry into Ybarra's criminal exposure at the time he went to the police and the treatment he was accorded thereafter—his argument really amounts to the unitary claim that Anthony Ybarra consistently lied during his testimony concerning details of his criminal record, the disposition of charges, and the benefits allegedly provided by the People—lies that went effectively unchallenged by defense counsel. Defendant's briefing on this point runs in excess of 15 pages; the government's particularized response is twice that length. Reading the detailed—and often necessarily tedious, given the nature of the claim—arguments of counsel, it is difficult to avoid the conclusion that must have been evident to the jurors: Ybarra was habitually in trouble with the law; indeed, as defense counsel put it to the jury in his opening statement, "you will learn that [Ybarra] has been ripping off Ceres at the K-Mart, and a number of other places down there, continuously . . . . And he has not yet been brought to book for the crime of petty theft with a prior for which he could go to prison . . . . He continues to feed the District Attorney information about this case to bolster it and, at the same time, he goes down to K-Mart and takes what he wants. He gets caught nearly every time."

We omit a lengthy recounting of the details of defendant's precise claims regarding Ybarra's alleged misrepresentations at this point, only because we have visited them extensively in connection with an earlier discussion of the cognate claim that the prosecutor committed misconduct in failing to disclose to the jury Ybarra's alleged misstatements to the jury concerning dispositions of his prior offenses. (See *ante,* at pp. 929-932.) What minor discrepancies may have crept into the record in the course of an examination and cross-examination of a history of priors comprising no less than 16 convictions would not likely have led to a different result had they not occurred. The jury obviously knew of Ybarra's criminal past (and present, for that matter) and the crucial role his testimony played in the People's case. That, in the end, the jury chose to credit his account was not the result of minor discrepancies in detailing before them his lengthy criminal history.

### e. *Defense counsel's closing guilt phase argument as constituting ineffective assistance.*

 In an extended argument focusing on defense counsel's closing jury argument at the conclusion of guilt phase evidence, defendant asserts that defense counsel failed to marshal effectively the evidence presented at trial in a manner that would exploit to the maximum the defects in the People's case—chiefly, the vulnerabilities in Anthony Ybarra's testimony. The centerpiece of this challenge is founded on the claim that counsel failed to point out to the jury testimonial conflicts in the timing of events on the night Esther Alvarado was murdered. Defendant asserts that the combined testimony of Officer Heckathorn, Lorenzo Guzman and Gabriel Ramos (the friend whom defendant visited on the night of January 4) conclusively established that Ybarra had to have been lying in his account of overhearing the plot in the trailer behind the Lawson house.

Defendant argues that instead of highlighting these discrepancies, as competent representation required, counsel's summation of the evidence was brief, disjointed, cursory, unfocused, and often beside the point. Had counsel handled the matter competently, defendant argues, counsel would have made some 35 comments on the evidence, all of which are elaborated in the brief on this appeal. We pretermit a detailed examination of these points in light of the established rule that "[t]he effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality." (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 634-635 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

Although not lengthy, counsel's closing argument occupies 35 pages of the trial transcript, half of which is focused on the credibility of Anthony Ybarra's testimony. More importantly, the strength and credibility of Ybarra's testimony was a focal point of the guilt phase of defendant's trial from the opening statements to the closing arguments. The jury scarcely needed a detailed road map in the form of closing argument to understand and evaluate the meaning of the evidence before it; including the significance of Anthony Ybarra's testimony. Although Ybarra was shown to be a habitual thief and drug addict whose reputation for truthfulness was questionable (and questioned), in the end the jury chose to credit his version of events. We cannot say, on this record, that his motives and history were not disclosed to the trier of fact, or that a more eloquent and professional summation of the evidence by defense counsel would likely have led to a result more favorable to defendant. (See, e.g., *People* v. *Cudjo, supra,* 6 Cal.4th at p. 635.)

### f. *Failure to request CALJIC No. 2.50 instruction.*

Defendant argues that the admission and significance of the prosecution's so-called "prior bad acts" or other crimes evidence—evidence, for example, that defendant had shot Irene the preceding summer and beaten Esther a week or so before her murder; that defendant and Prado dealt drugs; that defendant was a regular drug user—were the cornerstone of the prosecution's case and that trial counsel was incompetent in failing to request the court to read to the jury CALJIC No. 2.50 (to the effect that such other crimes evidence may not be used to prove that defendant is a person of bad character or has a disposition to commit crimes) and that, in any event, under the circumstances the trial court had a duty to read the instruction sua sponte. We first consider the claim that the trial judge was under a sua sponte duty to give a limiting other-crimes instruction.

We have long since held that "in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct." (*People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], fn. omitted.) Although our opinion in *Collie* recognized the possibility (one that had no application in that case) that there might be "an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and *minimally relevant to any legitimate purpose*" (*ibid.*, italics added), this is not such a case.

Rather, the significance of the other crimes evidence admitted against defendant here is closer to the sort we characterized in *People* v. *Bunyard* (1988) 45 Cal.3d 1189 [249 Cal.Rptr. 71, 756 P.2d 795], as "so highly relevant to the central issue" of the case "that there was little, if any, danger that the jury would consider such evidence for any . . . improper purposes . . . including general criminal disposition." (*Id.* at p. 1226.) Evidence of defendant's drug use and dealing and his belief, together with Brenda Prado's, that Esther and Irene had taken drugs for their own use without paying for them, and testimony that defendant had shot Irene and helped to administer a beating to the murder victim a week preceding her death, were highly probative on the central issue of the case, namely, whether Hernandez acted on his own to commit the murder or was hired by defendant and Prado to do so, and, if so, why. Such evidence was, as we said under factually similar circumstances in *People* v. *Bunyard, supra,* 45 Cal.3d at page 1226, "highly relevant and minimally prejudicial, the converse of the extraordinary case postulated in *Collie.*"

For closely similar reasons, defendant's alternate claim that defense counsel himself was negligent in failing to request an other-crimes limiting

instruction under CALJIC No. 2.50 also fails. As in *People* v. *Bunyard*, *supra*, 45 Cal.3d 1189, here also the possibility that such an instruction, had it been requested and given, would have led to a result more favorable to defendant is not reasonably probable, "since the likelihood of the jury's using the evidence for an improper purpose was so minimal under the facts of this case that any conceivable error was harmless." (*Id.* at p. 1226.) In any event, as we have noted, defense counsel unsuccessfully sought to keep this "bad acts" evidence from the jury in a pretrial hearing before the trial court.

2. *Claims of ineffective assistance of counsel at the penalty phase.*

a. *Failure effectively to present "lingering doubt" defense.*

Defendant argues that trial counsel's argument to the penalty jury of a "lingering doubt" was so perfunctory as to deny him the benefit of that defense. He notes that counsel's remarks on the subject take up less than a page of the trial transcript, that he neither defined for the jury the concept of lingering doubt nor reviewed the evidence on which such a defense could have been based. Compounding this deficiency, defendant argues, was the delay of an entire year between the guilt and penalty phases of the trial. Given the erosion of memory, he argues, it was all the more incumbent on trial counsel to refresh the jurors' memories by reviewing in detail the guilt phase evidence supporting residual doubts as to defendant's guilt.

As this court has noted in the past, however, the sword of the lingering doubt defense is double edged. (*People* v. *Fauber* (1992) 2 Cal.4th 792, 864 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Because such an argument risks " 'antagonizing a jury that has already found the defendant guilty,' " lingering doubt penalty defenses " 'are often unwise.' " (*Id.* at p. 864.) Given the jury's overwhelming rejection of defendant's alibi defense and his attack on Ybarra's credibility during the guilt phase, trial counsel might easily have decided that rehearsing that evidence once again during the penalty phase would have had a boomerang effect on the jury. Instead, counsel appears to have contented himself with mentioning to the jury at the penalty phase the possibility of lingering doubt and going on to focus on a different penalty defense: defendant's difficult childhood and youth, his love of his stepchildren, and his stability as a prison inmate. On this record, we are unprepared to fault such a seemingly sound tactical choice.

In addition to attacking the adequacy of trial counsel's presentation of the lingering doubt penalty defense, defendant faults counsel for failing to request a lingering doubt instruction. Here, however, as in *People* v. *Rodrigues*, *supra*, 8 Cal.4th 1060, 1187, the penalty jury heard both defense

counsel argue the lingering doubt defense and the trial court instruction to consider, if applicable, "any other circumstance which extenuates the gravity of the crime even though it is not legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." As in *Rodrigues, supra,* "these instructions were 'sufficient to encompass the concept of residual doubt about defendant's guilt.' [Citations.]" (8 Cal.4th at p. 1187.) Defendant would have obtained no additional benefit had trial counsel requested such an instruction and had the trial court agreed to give it. (*Ibid.,* and cases cited at p. 1187.)

b. *Failure to object to expert opinion testimony and to the prosecution's prejudicial argument based thereon.*

██ At the penalty phase of defendant's trial, the prosecution called to the stand Officer Terry Mann, a law enforcement veteran of 30 years, 14 of which had been spent in the Stanislaus County Sheriff's drug enforcement unit. Mann had previously testified as an expert witness regarding heroin use and trafficking, having worked with, talked to, and arrested hundreds of addicts. He testified on direct examination to the effect that no heroin addict had ever been cured of addiction by the use of methadone and that heroin addicts exploit such programs as a "free high." Mann's testimony was obviously designed to rebut defense evidence that because defendant had planned to enroll in a court-sponsored methadone treatment program and was scheduled to attend an orientation clinic on the morning of January 5, 1988—the day following Esther Alvarado's murder—he had no motive to want her dead.

Although defense counsel objected (unsuccessfully) to Mann's testimony on relevancy grounds, the claim here is that counsel failed to make an objection based on two additional grounds: First, that Mann was not qualified to give expert testimony on the efficacy of methadone as a means of reducing heroin dependency and, second, that he was not qualified to testify as an expert with respect to defendant's subjective mental state, that is, that defendant merely wanted to get "loaded" at taxpayer expense.

Compounding the error, defendant argues, was the use made of Mann's testimony by the prosecutor in his closing penalty argument. Methadone treatment, the prosecutor told the jury, "is a completely worthless endeavor as far as rehabilitation is concerned . . . [,] as a practical matter what it means on the street is a chance for a doper to go get a free fix . . . paid for out of taxpayers' dollars." Defense counsel's failure to object to this line of argument, defendant contends, amounted to ineffective assistance.

Officer Mann's testimony, however, avoided crossing the line between statements of fact and expressions of opinion. Having worked with heroin addicts for several years, Mann's testimony did no more than relate his observations of users and their experience in methadone treatment programs. The one occasion on which Mann did cross into matters of opinion came in response to a question from defense counsel: Did Mann, defense counsel asked, think that methadone programs were a complete waste of the taxpayers' money? Yes, Mann answered. But he also answered affirmatively when counsel asked him if he was aware that many psychiatrists and psychologists disagreed with that opinion.

Defendant quarrels with trial counsel's failure to challenge Mann's qualifications as an expert. Yet it is not difficult to see why counsel may have elected not to mount a challenge in the presence of the jury: Mann was easily qualified as an expert in matters relating to the enforcement of the drug laws and related matters; counsel may well have thought there was little to be gained in parading this expertise before the jury. Finally, any failure on the part of trial counsel to object to the prosecutor's penalty argument based on Officer Mann's testimony could not have been prejudicial. Even without Mann's testimony on the value of methadone programs, the jury was not likely to be convinced of the truth of defendant's claim that on the very night of Esther's murder he had planned to enroll in a treatment program the next morning and thus had no motive to protect his drug dealing business by having Esther murdered.

c. *Failure to object to cumulative evidence of a previous burglary.*

Defendant's claim here is that trial counsel was ineffective in failing to object to and prevent the introduction into evidence of a criminal complaint filed against defendant in 1969. The incident arose out of a teenage prank in which defendant climbed into an unoccupied fast-food drive-in (the M & M Drive-In) and pretended to serve his friends hamburgers. A passing police officer arrested defendant and charged him with burglary. Defendant's principal claim with respect to this incident goes to trial counsel's failure to object to admission of a criminal complaint detailing the 1969 arrest which contained references to counts in addition to the burglary charge indicating that defendant was armed with a "dagger."

While we have some doubt as to whether any member of the jury actually *saw* the reference to the dagger (and we observe that neither the prosecutor nor defense counsel mentioned defendant's possession of a knife on the night of the burglary incident), the trial court's instructions to the jury regarding aggravating circumstances included an enumeration of those acts

of defendant that could properly be used as circumstances in aggravation. These included assault by means of force likely to produce great bodily injury, assault with a deadly weapon, assault on a peace officer, simple assault and battery, exhibiting a firearm, attempted robbery, being an ex-convict in possession of a firearm, and child abuse; they did not include possession of a dagger. In any event, any lapse by counsel could not have been prejudicial because the jury properly learned of several more egregious incidents involving criminal behavior, including some involving firearms and other weapons.

### d. Failure to submit instructions on and argue defendant's domination by Brenda Prado.

■ Next, defendant argues that trial counsel was incompetent in failing to argue and submit instructions with respect to two relevant factors in mitigation of the crime. First, he contends that counsel should have argued, on the basis of Anthony Ybarra's testimony to the effect that defendant and Brenda Prado stated to Jesse Hernandez in the meeting at the trailer that Esther "deserved to die," that defendant committed the offense charged "under circumstances which [he] reasonably believed to be a moral justification or extenuation for his conduct." (Pen. Code, § 190.3, factor (f).) That is, defendant argues that the penalty jury might have been led to consider as a factor in mitigation the notion that defendant reasonably believed that he was morally justified in hiring Jesse Hernandez to murder Esther because she had stolen drugs from him, drugs which he possessed to sell to other addicted users. We are not prepared to fault trial counsel for presumably reaching a contrary conclusion, and leave the matter at that.

Defendant's second contention under this rubric is that trial counsel failed to marshal the evidence for and request instructions relating to the mitigating factor that defendant "acted under . . . the substantial domination of another person" (Pen. Code, § 190.3, factor (g)), namely, Brenda Prado. But this argument, too, fails in light of the evidence of record. Ybarra's testimony, if credited, portrayed defendant as an active participant in planning Esther's murder. Moreover, Prado's "dominant" role in managing the couple's drug sales was offset by evidence that she had attempted repeatedly to help defendant quit drugs, that defendant had been a user and dealer before meeting Prado, that he continued to deal drugs after Prado took over the business, and that Prado was initially reluctant to become involved in drug dealing. In light of this substantial evidence to the contrary, there is little or no factual basis for faulting trial counsel for not offering argument or instructions designed to highlight claims of Prado's domination.

e. *Failure to object to comments by the prosecutor and associated claims of prosecutorial misconduct.*

As he did with respect to the guilt phase of the trial, defendant attacks defense counsel's conduct of the penalty phase, asserting that his performance fell short of constitutional standards in numerous ways. We consider these claims in the order presented.

(1) *Misrepresenting the evidence in closing argument.*

 Defendant contends that in his closing argument to the jury at the penalty phase, the prosecutor misrepresented the evidence in three significant respects, and that, in failing to object, trial counsel's assistance was constitutionally ineffective. First, he contends that the prosecutor argued facts not in evidence when he suggested to the jury that Irene Castillo had "fingered" Esther as the person who stole drugs from defendant and Prado. Defendant contends that there was no evidence to support this assertion and that it was damaging in that it provided the jury with a motive for defendant's desire to have Esther murdered, thereby negating any "lingering doubt."

The testimony as a whole, however, fairly supports an inference that Castillo did in fact identify Esther as having stolen defendant's drugs. The train of evidence is sufficient to establish the following: that drugs were stolen from defendant and Prado; that the two later barred Esther from visiting the house where they lived; that Castillo was accused by defendant of having stolen the drugs and was later shot by defendant following a violent quarrel over the theft of drugs; that Castillo soon afterward was heard screaming at Esther, accusing her of being responsible for the shooting; and that defendant and Prado later complained to Hernandez that Esther had stolen dope from them. Given this evidence, the prosecutor was entitled to argue to the jury the inference that Irene Castillo had fingered Esther as the thief to defendant and Prado.

Second, defendant argues that the prosecutor misrepresented the evidence when, in describing Ybarra's testimony as to what he observed and overheard inside the trailer, he argued to the jury at the penalty phase that defendant was "nodding in the affirmative at various points when he is not speaking in the affirmative." Defendant claims that no evidence supports the contention that defendant nodded or made any gestures in the course of the trailer conversation and that the prosecutor's characterization was misleading and prejudicial in eliminating a lingering doubt defense.

The prosecutor's characterization of defendant as "nodding" during the course of the trailer conversation, however, came in response to a defense

comment that defendant was "nodding . . . from the use of heroin or cocaine," perhaps the mainstay of the defense at trial—that is, that defendant was a hopeless heroin addict substantively uninvolved in the plot to murder Esther. It was in rebuttal to that line of argument made by the defense to the penalty jury that the prosecutor contended—in an obvious play on the word "nod," employed by defense counsel—that defendant was not "nodding off" but "nodding in the affirmative at various points when he is not speaking in the affirmative." Especially in light of the evidence of the extent of defendant's participation in the trailer conversation, the prosecution's argument fell within the latitude provided for fair comment on the evidence. We find no error on this score.

Finally, defendant claims that the prosecutor misrepresented the evidence when he characterized defendant, before the penalty jury, as having "talked up" Esther's murder to Hernandez and manipulated the latter into agreeing to commit it. This characterization of the critical conversation in the trailer overheard by Anthony Ybarra was directly contrary to defendant's principal defense that he was in a drug-induced stupor at the time of the conversation and had no real role in the conspiracy to murder Esther. The prosecutor's argument did not stray substantially from what the testimony of Ybarra would rationally support. Ybarra's account was subject to differing characterizations as to the extent of defendant's participation, and the conflicting claims of both sides based on that testimony were for the jury to resolve. In any event, the prosecutor's comments did not depart so far from the evidence as to constitute a misrepresentation of Ybarra's testimony.

(2) *Inflammatory remarks in closing argument.*

■■■ As he argued with respect to the prosecutor's closing argument at the guilt phase of his trial, defendant renews his contention that the prosecutor's argument to the jury at the close of the penalty phase was misconduct, being inflammatory and designed to appeal to the jurors' passions and prejudices. He adds that his trial counsel was ineffective in failing to object to this alleged misconduct.

Defendant fixes on several references by the prosecutor to defendant as being associated with "a nest of dopers," as still being a drug addict, and "still with the same attitudes as an addict," arguments that defendant should be sentenced to death because he sold drugs, that he profited from acts of prostitution by Esther Alvarado, Irene Castillo and Betty Lawson, and that he should be sentenced to death in order to "save his children." ■■■ It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information

or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 284 [266 Cal.Rptr. 834, 786 P.2d 892].) But it is also "not only appropriate, but necessary, that the jury weigh the sympathetic elements of [a capital] defendant's background against those that may offend the conscience," because it is at the penalty phase of a capital trial that "the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death." (*People* v. *Haskett, supra*, 30 Cal.3d at p. 863.)

 Examined under this standard, we do not find the prosecutor's arguments at the penalty phase to have been inappropriate. The evidence amply established that defendant was a heroin addict who supported himself and his children not only directly from the sale of drugs but indirectly from acts of prostitution by Esther Alvarado, Irene Castillo and Betty Lawson carried out at the Lawson house, where defendant and Prado lived, in order to support their drug habits.

Finally, defendant contends that trial counsel was ineffective in failing to object to the prosecutor's speculation at the penalty phase that defendant was likely to join a prison gang and kill for drugs if sentenced to life in prison without possibility of parole. While this argument may have been beyond the bounds of legitimate argument, trial counsel did in fact lodge an objection with the court which had the effect of truncating the prosecutor's line of argument. The fact that counsel did not follow up by asking the trial court to admonish the jury to disregard the prosecutor's comments regarding prison gang membership may well have been a tactical decision taken to avoid focusing the jury's attention on what amounted to a passing comment by the prosecutor.

(3) *Impermissibly commenting on the credibility of defendant's testimony.*

 Defendant also contends that the prosecutor's statement, in commenting to the jury on a lengthy account by defendant of a dream he had after overdosing on heroin, that it was "one of the more transparently made-up stories I have ever heard as a DA," amounted to misconduct. Assuming that such a comment amounted to misconduct—as implying either that the prosecutor had knowledge not disclosed to the jury (see *People* v. *Heishman, supra*, 45 Cal.3d at p. 195) or stating a personal opinion (see *People* v. *Green, supra*, 27 Cal.3d at p. 35)—it cannot be deemed prejudicial on this record. In addition, defendant contends that the prosecutor improperly belittled defense counsel, commenting at one point that "the law is what

it is, whether [defense counsel] likes it or not." This comment hardly constituted a " 'personal attack[] on the integrity of opposing counsel,' " was not "a deceptive or reprehensible method of persuasion," and did not "render the trial fundamentally unfair"; it thus did not amount to misconduct. (*People* v. *Gionis*, *supra*, 9 Cal.4th at pp. 1215, 1218.)

(4) *Impermissibly arguing that defendant's denial of guilt demonstrated the absence of remorse.*

■ Defendant argues that the prosecutor impermissibly argued to the jury that his denial of guilt for the murder of Esther Alvarado demonstrated an absence of remorse supporting the death sentence and that trial counsel rendered ineffective assistance in failing to object to such an argument. The People concede that the remark was misconduct but argue that defense counsel's failure to object was probably a conscious tactical decision and a sensible one at that, taken so as not to draw the jury's attention to remarks that were, in context, fleeting. We agree.

(5) *Alleged trivializing of the penalty jury's function.*

■ In a brief argument, defendant quotes from the transcript of the prosecutor's closing penalty argument, claiming that his remarks misstated the law by giving the jurors the misleading impression that they need only "follow [the] law" regarding death penalty eligibility. Defendant argues that these comments are analogous to those condemned in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], where we held that the trial court's instruction regarding the possibility of future gubernatorial commutation was error because, among other vices, it "may tend to diminish the jury's sense of responsibility for its action." (*Id.* at p. 157; see also *People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669] [improper for prosecutor to argue that jury must return death penalty if aggravating factors outweighed mitigating factors despite differing personal conclusions].)

These precedents have no application in this context, however. Not only did defense counsel successfully interpose an objection to the prosecutor's argument, quoted above, regarding "following the law," thus forcing a modification, but the prosecutor went on to tell the jurors to "look at everything on balance," to "be convinced as to each one of the factors," and to make "an individual decision that you make yourself reviewing all the facts . . . as to what weight there is to be assigned." Defendant insists that trial counsel's objection was practically futile, arguing that the prosecutor continued with the same improper line of argument. But we do not read the

record as establishing that proposition. Assuming the prosecutor's argument was improper prior to defense counsel's objection (as suggesting that the Legislature was free of any constitutional restraints on its power to impose capital penalties), it was not so following defense counsel's successful objection. There was thus no basis for a *second* objection by defense counsel.

(6) *Allegedly misleading the penalty jury regarding the law of mitigating factors.*

■ Defendant also seizes on additional remarks by the prosecutor in his closing penalty phase argument which, he asserts, improperly attempted to diminish the force of defense arguments that defendant's background of drug and alcohol addiction were factors in mitigation. Because the prosecutor's remarks (to the effect that "If that's true [i.e., that defendant's family background of alcoholism and drug addiction was a factor in mitigation] nobody is ever going to be convicted of a crime again. . . . We might as well do away with the criminal justice system . . . .") impliedly invited the jury to equate mitigation with factual innocence, defendant argues, they constituted misconduct.

Considered in their context, we do not read the prosecutor's remarks as equating mitigation with innocence. Rather, the tenor of the argument was that the fact that defendant came from a family with a history of alcohol and drug abuse did not excuse his conduct in conspiring to murder Esther Alvarado. The jurors were simply invited to assess defendant's conduct and family situation in light of their own knowledge. The argument was entirely proper and there was no misconduct in making it.

(7) *Ineffective assistance of counsel in introducing defendant's prison psychiatric records and failing to object to prosecutor's alleged misuse of the records in closing penalty phase argument.*

■ As part of the penalty phase defense, counsel called as witnesses several correctional officials to testify, in substance, that defendant performed well in a highly structured environment such as a prison and was a suitable candidate for a sentence of life without parole. In the course of presenting that component of the penalty defense, trial counsel introduced into evidence defendant's correctional records. Among these was a copy of a report written by a Dr. Cole, a prison psychiatrist, dated October 1975, which, although never mentioned by defense counsel in his argument to the jury, was exploited by the prosecutor in his closing penalty argument.

Relying on statements in Dr. Cole's psychiatric report, the prosecution was able to argue to the jury that defendant had been diagnosed as exhibiting

a moderate to high potential for violence under normal circumstances and an extreme potential for violence when inebriated. Because trial counsel made no use of the prison psychiatric report and it was, in fact, prejudicial to his defense, defendant contends there was no tactical basis for its introduction, a blunder that amounted to ineffective assistance. Moreover, counsel's failure to object to the use of the contents of the psychiatric report by the prosecution in its closing penalty phase argument only compounded the defense error, defendant asserts.

We take a different view of Dr. Cole's report and trial counsel's handling of it. As mentioned, the defense called several corrections officials to testify on defendant's behalf at the penalty phase. Among these was Jerry Enomoto, a university professor of criminology and former Director of the California Department of Corrections. Professor Enomoto testified that, on the basis of his review of defendant's corrections file (which included Dr. Cole's two-page 1976 evaluation), he had concluded that defendant would probably be a "conforming" rather than a problem inmate.

Given that Professor Enomoto's expert testimony was based on materials which included Dr. Cole's report, defense counsel could either move for their admission himself, in the hope that the jury would overlook a two-page report "buried," as defendant notes, "in defendant's correctional records," or wait for the prosecution to do so. The latter course would have carried with it an enhanced likelihood that the prosecution would showcase Dr. Cole's report. That, in the event, the prosecution eventually did so was not the fault of trial counsel's tactical choice. Moreover, trial counsel might reasonably have concluded that, since Dr. Cole's evaluation had not been particularly troublesome to Professor Enomoto, the jury as well would not find it especially prejudicial.

3. *Posttrial claims of ineffective assistance of counsel: failure to move for a new trial.*

 Defendant points to what he characterizes as the "suspicious circumstances" surrounding the dismissal of a municipal court criminal complaint against Anthony Ybarra, charging him with possession of a hypodermic needle or syringe, following the completion of Ybarra's testimony. He contends that trial counsel was ineffective in not seeking a new trial based on that circumstance. Although the dismissal of the municipal court complaint might qualify as "newly discovered" evidence within the meaning of Penal Code section 1181, subdivision 8, it is unlikely that the evidence would have met the two additional criteria required to support a new trial motion under the statute: that it not be cumulative and that it would "render

a different result probable on a retrial." (See, e.g., *People* v. *McDaniel* (1976) 16 Cal.3d 156, 178 [127 Cal.Rptr. 467, 545 P.2d 843]; *People* v. *Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203]; see also *People* v. *Delgado* (1993) 5 Cal.4th 312 [19 Cal.Rptr.2d 529, 851 P.2d 811].) We conclude, therefore, that such postverdict evidence would not likely have succeeded and that trial counsel was not ineffective in failing to seek a new trial on that basis.

## III. PENALTY PHASE ISSUES

1. *Claim that the death penalty is disproportionate to defendant's culpability (individual and intracase proportionality).*

Defendant requests that we judicially notice the fate of Brenda Prado, who was sentenced following her conviction to a prison term of 26 years to life. (*People* v. *Prado* (Feb. 1, 1994) F016385 [nonpub. opn.]).[6]) On the basis of that sentence, together with the testimony of Anthony Ybarra and inferences drawn from it regarding the extent of defendant's role in the hiring of Hernandez, defendant contends that a sentence of death is disproportionate to the degree of his participation in the conspiracy. It was Prado, he argues, who conducted the actual negotiations with Hernandez, and Hernandez himself who first raised the possibility of killing Esther; defendant's role consisted of little more than expressing concern that Brenda was offering Hernandez too much in the way of drugs for the killing, heightening his anxiety over the source of his next heroin injection.

The claim, to the extent that it requests us to weigh defendant's moral guilt and death sentence alongside Brenda Prado's participation in the murder and resulting prison sentence is foreclosed by our opinion in *People* v. *Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984]. "Properly understood," we wrote, "intracase proportionality review is 'an examination of whether *defendant's* death sentence is proportionate to *his* individual culpability, irrespective of the punishment imposed on others.' [Citation.]" (*Id.* at p. 1014, original italics omitted, italics added.)

In addition, defendant's argument on the merits of his *individual* guilt and the jury's sentence of death is foreclosed by our opinion in *People* v.

---

[6]At the request of both parties and pursuant to Evidence Code section 459, we judicially notice the unpublished opinion of the Court of Appeal, Fifth Appellate District, in *People* v. *Prado, supra,* F016385, including that court's statement that Brenda Prado was convicted, following a jury trial, of first degree murder (Pen. Code, § 187), conspiracy to commit murder (Pen. Code § 182, subd. (a)(1)), and solicitation of murder (Pen. Code, § 653f, subd. (b)). The jury also found true two firearm enhancements to the first degree murder count but found that the special circumstance alleged (murder for hire) was not true.

*Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676]. In *Marshall*, defendant was convicted and sentenced to death for the murder of the mother of a former school friend of one of his coconspirators, a killing carried out in concert with two others, one of whom was shown by the evidence to have served as the "mastermind" of the trio's scheme to steal weapons from the victim's home. In rejecting defendant's disproportionality claim we acknowledged that " '[t]he cruel and unusual punishments clause of the Eighth Amendment . . . prohibits the imposition of a penalty that is disproportionate to the defendant's *personal responsibility and moral guilt*." [Citations.] Article I, section 17, of the California Constitution separately and independently lays down the same prohibition.' " (*Id.* at p. 938, italics added, quoting *People* v. *Poggi* (1988) 45 Cal.3d 306, 349 [246 Cal.Rptr. 886, 753 P.2d 1082].)

We recognized "that arguably defendant is not the most heinous murderer and that his crime is not the most abominable murder." (*People* v. *Marshall*, *supra*, 50 Cal.3d at p. 938.) "But," we reasoned, "there is no blinking the fact that after planning and in cold blood [defendant] executed a helpless woman in order to eliminate a witness. In view of that fact, we cannot conclude that death is disproportionate to defendant's personal responsibility and moral guilt." (*Ibid.*) The circumstances in this case, although not identical to those in *Marshall*, are analogous. As in *Marshall*, defendant is not the most heinous murderer nor is his crime the most abominable. And, while it is at least arguable that defendant's role in the plot to kill Esther Alvarado was less substantial than that of Brenda Prado, "the Eighth Amendment . . . does not require us to incorporate into our proportionality determination any comparison of defendant's sentence with that of another culpable person, whether charged or uncharged. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 53) . . . ." (*People* v. *Hill*, *supra*, 3 Cal.4th at p. 1014.) Defendant's sentence "is proportionate to *his* crime." (*Ibid.*, italics in original.) His moral guilt for the role he took in the planning and execution of Esther Alvarado's murder does not cross the constitutional threshold: we cannot conclude that death " 'is disproportionate to defendant's "personal responsibility and moral guilt." . . .' " (*People* v. *Marshall*, *supra*, 50 Cal.3d at p. 938.)

2. *Instructional error regarding possession of a gun by an ex-felon.*

 Defendant's claim under this rubric is that, in instructing the jury at the close of the penalty phase regarding the circumstances in aggravation and mitigation, the trial court erroneously stated that evidence had been introduced which showed that defendant was an "ex-convict in possession of a firearm," and that such possession ". . . involved the express or implied use of force or violence or the threat of force or violence." Relying on our

opinion in *People v. Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383], defendant argues that this portion of the instruction was vague and prejudicial because it wrongly led the jury to believe that every time defendant carried a firearm, he did so for the purpose of committing an act of violence.

It is true that in *People v. Satchell, supra,* 6 Cal.3d 28, we reversed a conviction of second degree murder in which the jury was instructed on a theory of felony murder based on defendant's possession, as an ex-felon, of a concealable weapon. But the reasoning supporting our reversal of the judgment in that case was founded on the nature of a determination whether the predicate felony was "inherently dangerous," a determination that is made, we explained, on the basis of " 'the elements of the felony *in the abstract,* not the particular "facts" of the case.' " (*Id.* at p. 36, quoting *People v. Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647], italics added.)

In the administration of the penalty provisions of Penal Code section 190.3, however, we have often said that the analysis is not one that is made on the basis of the abstract, *definitional* nature of the offense: "We have consistently rejected the contention that evidence relating to prior violent activity is strictly confined to the circumstances demonstrating the prior felony conviction. [Citations.] As we stated in *People v. Robertson* (1989) 48 Cal.3d 18. . . : ' "When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense." . . . Hence, the statute permits the introduction of all evidence of violent crimes whether or not they result in a conviction, except those of which the defendant has been acquitted.' " (*People v. Fierro* (1991) 1 Cal.4th 173, 231 [3 Cal.Rptr.2d 426, 821 P.2d 1302], italics in original.)

Here, the principal factual predicate for the "ex-felon" instruction was what at trial came to be called the "Long Beach incident" in which, as the two arresting police officers testified at trial, defendant was armed with a concealed, loaded handgun which he pointed at them in the course of a violent struggle in a 7-Eleven convenience store and the adjoining parking lot. In addition, there was evidence that defendant had shot one of his stepdaughters—Irene Castillo—in the course of a quarrel which the prosecution contended was provoked by Irene and Esther's theft of drugs from defendant and Brenda Prado. Because both of these incidents plainly involved *actual* force or violence, as prescribed by section 190.3 of the Penal Code, the trial court's instruction was not flawed and there was no basis for defense counsel to object successfully.

### 3. *Erroneous instructions regarding defendant's commission of attempted robbery.*

As part of its sentencing instructions to the jury at the close of evidence at the penalty phase, the trial court stated that evidence had been introduced for the purpose of showing that defendant committed an attempted robbery, an act, the court's instructions stated, involving "the express or implied use of force or violence or the threat of force or violence." In an argument related to the one made in his challenge to the jury instruction regarding the possession of a firearm by an ex-felon, discussed above, defendant contends that this part of the aggravation instruction was error because the district attorney declined to file charges against defendant after the Long Beach incident, the absent factual predicate, defendant claims, for the court's instruction. In effect, the argument is that where such prior bad acts are *not charged*, the court may not use them as the basis for an aggravation instruction. Defendant also contends that the evidence was insufficient to sustain a charge of attempted robbery.

As we have noted above, however, our cases construing Penal Code section 190.3, factor (b), make it clear that it is the *conduct* of the defendant, rather than the *fact of conviction*, that is probative in the administration of the penalty phase of a capital proceeding. (See, e.g., *People* v. *Fierro, supra,* 1 Cal.4th at p. 231.) Accordingly, we have held that a dismissal of charges by the district attorney is not an acquittal within the meaning of section 190.3, factor (b). In addition, as in the case of defendant's possession of a firearm in the Long Beach incident, the question of the penal significance of his conduct in the convenience store and with the police officers was for the jury to determine. The evidence was sufficiently substantial to sustain a finding that defendant attempted to commit an armed robbery. (Cf. *People* v. *Vizcarra* (1980) 110 Cal.App.3d 858 [168 Cal.Rptr. 257].) Beyond that we need not inquire.

### 4. *Claim that the jury did not listen to the evidence and understand or follow the law.*

Prior to the presentation of evidence at the guilt phase of defendant's trial, the court in effect instructed the jury that defendant was charged with entering into a conspiracy with Hernandez and Prado to murder Esther Alvarado. As part of its instruction, the trial court enumerated the eight overt acts with which defendant had been charged in the information. At the conclusion of the evidence at the guilt phase, the jury was instructed that, in order to find defendant guilty of conspiracy, it must find not only an unlawful agreement and specific intent, but proof of the commission of *at*

*least one* of the overt acts alleged in the information. "The term 'overt act,' " the trial judge instructed the jurors, "means any step taken . . . by one or more of the conspirator[s] which goes beyond mere planning or agreement to commit a public offense . . . ."

In it verdict form, the jury found that seven of the eight "overt" acts alleged in the information were true (all but number seven—that defendant had offered to provide Hernandez with a shotgun for the purpose of killing Esther). Acts one through six—none of which were overt because still within the ambit of "mere planning or agreement to commit a public offense"— consisted of the meeting in the Lawson trailer on the night of January 4, Hernandez's statement to the others that he had left Esther in a bar, statements by defendant and Prado to Hernandez that Esther should "be done in," the offer of narcotics to Hernandez in return for the murder of Esther, Hernandez's agreement to carry out the killing, and the transfer of a quantity of drugs from defendant and Prado to Hernandez. The eighth and final "overt" act listed on the jury's verdict form, however, was the finding that ". . . Hernandez did, thereafter, meet with Esther Alvarado and did kill her in furtherance of the conspiracy."

Defendant claims on the basis of the verdicts as indicated on the verdict form that the jury was "irrational," pointing to the fact that the first six of the alleged overt acts cannot serve as predicate acts for the conspiracy alleged against defendant because they are preparatory, as the trial court had noted in its closing instructions. In addition, defendant asserts that there was no evidence supporting the third overt act alleged—that defendant and Brenda Prado told Hernandez that Esther was a police informant—other than the argument of the prosecution. In light of this alleged evidence of jury misunderstanding, defendant argues that we should set aside the presumption that "jurors follow the [trial] court's instructions." (*People* v. *Bonin* (1988) 46 Cal.3d. 659, 699 [250 Cal.Rptr. 687, 758 P.2d 1217].)

The People concede defendant's claim that the jury's verdict forms for count two of the information erroneously put an "X" mark next to each of the alleged overt acts (with the exception of number seven), indicating their apparent finding that those acts were committed for the purpose of carrying out the objects or purposes of the conspiracy. The People disagree, however, as to the significance that should be ascribed to what it argues was, at most, error in the court's instructions rather than evidence of a "runaway" jury. Because the jury was instructed not once but twice that each of the eight acts alleged in the information were overt acts, any one of which was sufficient to support a conspiracy conviction, the government argues, the jury cannot be faulted for following an incorrect summary of the law given by the trial court.

The People likewise concede the absence of evidence supporting overt act number three—that defendant and Prado told Hernandez that Esther was a police informant. But that, too, far from being evidence of the jury's persistent disregard of the court's instructions, was no more than a "misrecollection" (to adopt the government's characterization) by the jury of the court's instructions. Because there *was* evidence that Esther was an informant (although none that Prado and defendant were aware of that fact), and the prosecutor argued that this was a motive for Esther's murder, the more likely explanation for the jury's finding on this point is confusion rather than a deliberate refusal to following the court's instructions. In any event, although the trial court's instruction characterizing the first seven of the acts enumerated in the information as "overt" was an error later faithfully (if incompletely) reflected in the jury's verdict form, there was no prejudice to defendant: the eighth and final act listed in the information and found true by the jury—Hernandez's actual killing of Esther in furtherance of the conspiracy—clearly qualified as overt and was legally and factually sufficient.

5. *Failure to provide defendant with a record adequate to pursue an appeal.*

 Defendant contends that the trial judge failed to observe the requirements of Penal Code section 190.9, subdivision (a), that "all proceedings conducted in the . . . municipal, and superior courts, including proceedings in chambers, shall be conducted on the record." Specifically, he asserts that discussions between counsel and the trial judge—including those relating to jury instructions—went unreported. He then summarily asserts that, had they been transcribed as required by statute, the record "would . . . further substantiate that Defendant was rendered ineffective assistance of counsel."

We recently considered the standard under which claims of an inadequate appellate record are evaluated in *People* v. *Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1]. We noted that, although error, the failure of the trial court to conform to the requirement of Penal Code section 190.9 "is not one that is reversible error per se." (4 Cal.4th. at p. 1333, fn. 70.) "Even in the absence of a waiver," we said, "a complaining party bears the burden of demonstrating that the appellate record is not adequate to permit meaningful appellate review." (*Id.* at p. 1334, fn. 70, citing *People* v. *Howard* (1992) 1 Cal.4th 1132, 1165 [5 Cal.Rptr.2d 268, 824 P.2d 1315] [Although a defendant is "entitled to a record that is adequate to permit meaningful appellate review," it is "defendant's burden to show that deficiencies in the record are prejudicial."]; see also *People* v. *Chessman* (1950) 35 Cal.2d 455, 462 [218 P.2d 769, 19 A.L.R.2d 1084] ["if in truth there does

exist some consequential inaccuracy or omission, the appellant must show what it is and why it is consequential"].)

In the instances cited by defendant, the omissions were not prejudicial because the record "is adequate to permit defendant to argue each of the points purportedly addressed in the unreported conferences." (*People* v. *Howard, supra*, 1 Cal.4th at p. 1165.) With respect to defendant's assertion that he was prejudiced by the failure to transcribe discussions of jury instructions, for example, the record discloses that the trial court indicated on the record that defense counsel was "not going to approve the instructions," and that defendant's trial counsel then stated for the record that all instructions he had requested had been given: "I am willing to say all the instructions I have offered have been given, if that is of any benefit. I mean that is clearly in the record . . . the fact that you gave them."

Similarly, defendant asserts that trial counsel raised an objection to the admission of evidence relating to the Long Beach incident that went unreported. But that omission loses any significance in light of an extensive (and reported and transcribed) hearing held outside the presence of the jury at which, the record indicates, defense counsel moved to suppress the officers' testimony and (as counsel later stated at a posttrial hearing to settle the appellate record) alternatively sought a continuance to investigate the Long Beach incident.

It is thus possible to piece together the substance of the unreported discussions between counsel and the court and for appellate counsel "to argue each of the points purportedly addressed in the unreported conferences," had he chosen to do so. (*People* v. *Howard, supra*, 1 Cal.4th at p. 1165.) Finally, defendant summarily alleges that "a number of off-the-record discussions" took place during the course of the trial and "before the Municipal Court." He makes no effort, however, to describe the circumstances of these discussions, to explain why they could not be reconstructed by a settled statement or, most critically, how they were consequential. He has thus failed to meet his burden of showing prejudice.

*6. Error in the trial court's ruling on defendant's automatic motion to reduce penalty.*

 In denying defendant's automatic motion to reduce the jury's recommendation of the death penalty to a sentence of life without possibility of parole, the trial judge relied on, among other findings in aggravation, that defendant had attempted the armed robbery of the Long Beach convenience store and, as defendant puts it, ". . . wanted the victim [Esther Alvarado]

killed as evidenced by his . . . offer [to Hernandez of] the use of a weapon that he had." Arguing with a store clerk at 2 o'clock in the morning over the purchase of some beer, defendant argues, even with a handgun concealed in his waistband, is *not* attempted armed robbery. Moreover, at the conclusion of the guilt phase the jury expressly found that defendant had *not* offered a murder weapon to Hernandez, as alleged in the information. The trial court's reliance on these erroneous findings as aggravating circumstances, defendant argues, violated his due process rights.

The difficulty with defendant's argument under this heading is twofold. First, characterizing his conduct in the convenience store as "arguing over the purchase of beer" substantially misstates the testimony of the two police officers, as well as the findings of the trial judge in ruling on the automatic motion for sentence modification. The officers testified that after subduing defendant and taking him to the station house, he told them that he had entered the store with a pistol because he needed money, having "just [done] 25 months in the joint and . . . [was] broke." In addition, defendant told the officers that he "would have had to" shoot the officers since he was "not going back to prison."

Moreover, the trial court made its findings in the context of a weighing process, guided by Penal Code section 190.3, factor (e), in which the aggravating and mitigating circumstances enumerated in that section are placed in the balance. The court's findings that defendant impliedly admitted that he intended to rob the convenience store, that he struggled with the officers and pointed a loaded pistol at them, and that he stated he would have shot them, are all supported by the evidence and constitute a "use or attempted use of force or violence or the express or implied threat to use force or violence" within the meaning of the aggravating factor in section 190.3, factor (b).

Thus, even though defendant is correct in pointing out that the trial court erred in concluding that defendant had offered Hernandez a weapon with which to murder Esther (it was, by implication, error under the analysis we recently employed in *People* v. *Cudjo, supra,* 6 Cal.4th 585, 636), that point was only one of two supporting the court's finding. In context, the trial judge relied on *both* the erroneous finding of an offer of a murder weapon *and* defendant's statement, as related by Anthony Ybarra, while in the trailer with Brenda Prado and Hernandez that he wanted to "blow the bitch away," a sentiment that is both sustained by the evidence and obviously aggravating.

Although we find no error, even had the trial judge erred in relying on defendant's expressed desire to have Esther murdered, it would not have

been prejudicial, given the strength of the evidence in aggravation cited by the trial court and the absence of mitigating factors. The penalty issue was not a close one for the trial court, and a more favorable result absent the alleged error is not a reasonable possibility. (See, e.g., *People* v. *Howard*, *supra*, 1 Cal.4th at pp. 1193-1196.)

7. *Claim that the death penalty violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution.*

As part of a general assault on the constitutionality of the death penalty statute, defendant seizes on certain features of the prosecutor's closing penalty argument. First, defendant contends that the prosecutor's reference to the fact that he and Esther were friends as a circumstance in aggravation is impermissibly vague, since a killer's familiarity with the victim would be a circumstance in almost every case. The prosecution's reference to defendant's friendship with Esther Alvarado was not so isolated a comment, however.

In context, this part of the prosecutor's argument was directed at demonstrating far more than defendant's simple familiarity with his victim. He argued that the evidence showed that Esther Alvarado was "a woman that defendant himself calls a friend, a woman who was a guest in their house, along with her child, a woman that they knew was buying dope from them with money she was having to earn by prostituting herself, a woman that they knew was a heroin addict with the same cravings that he understood all too well, a woman that they knew would be compelled to steal by those cravings . . . . They knew that woman. . . . This is a friend, a house guest, a young mother that they knew, that they did away with callously to make an example out of to protect their business."

Next, defendant contends that the prosecutor improperly told the jury that the conditions under which defendant raised his stepchildren—conditions under which "they didn't have a chance"—were a circumstance in aggravation. But that was not the gist of the prosecutor's remarks in this part of his closing argument. Rather, the argument was directed at tying Esther's murder to the prior incident during which defendant shot his stepdaughter Irene, believing, the prosecution argued, that she and Esther had combined to steal dope from him: "You've got Irene to contend with. It's connected to the facts of this case. It's also evidence of other criminal behavior. No matter which place you place it under, it's further evident of a circumstance in aggravation . . . . This guy shot his own stepdaughter because he held her initially responsible for drug rip-offs. The best thing . . . that ever happened to those children that they had in that house is that these two people to get

arrested and to end that dope-selling environment that those kids were living in . . . . Is it any wonder in that kind of an environment that one of the stepdaughters, Irene, turn up to be a heroin abuser herself? Those kids didn't have a chance."

Defendant also argues that the prosecutor's statement that defendant's "caus[ing] his family the trauma of the trial was a factor to weigh in determining whether to impose the death penalty" was improper. Read in the context of the closing arguments, however, the prosecutor's remarks were not improper. They came in rebuttal to a theme presented in defense counsel's closing argument, relying on the testimony of defendant's step-daughters at the penalty phase to the effect that they loved him and wanted to visit him in the future. It was in response to this line of testimony and defense argument that the prosecutor stated to the jury that "what's offered to you . . . by the defense . . . is the sympathy for the family . . . . But ask yourself, when you consider that, this question: Who made the situation the way it is right now? Who put them in the position of coming into court to try to comment about the good things he's done . . . Who is it that put them in the posture where their parents are both in jail facing death-penalty murder charges?" Prefaced as it was by a reading to the jury of the text of factor (k) of Penal Code section 190.3 ("Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime"), the prosecutor's remarks were proper rebuttal argument. (See, e.g., *People* v. *Noguera, supra*, 4 Cal.4th at pp. 643-644 and cases cited.)

Defendant also summarily presents 11 other claims of unconstitutionality related to the death penalty statute, all of which we have rejected in the past. Nothing presented in the brief persuades us that we should revisit these contentions.

8. *Giving of CALJIC No. 2.90 as permitting the jury to convict defendant based on an unconstitutional degree of proof.*

Defendant claims that by reading CALJIC No. 2.90—California's standard "reasonable doubt" instruction—the jury was permitted to convict him under a lesser standard of guilt than that required by constitutional standards of due process. Since defendant's opening brief was filed, the United States Supreme Court has sustained CALJIC No. 2.90 against federal due process attack. (See *Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155, 185-186 [14 Cal.Rptr.2d 342, 841 P.2d 862]; see also *People* v. *Freeman* (1994) 8 Cal.4th 450, 501-501 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]; *People* v. *Crittenden, supra*, 9 Cal.4th 83, 142-144. We accordingly reject this claim.

9. *Error in failing to instruct the jury that a sentence of life without parole meant defendant would never be parole eligible.*

 Defendant asserts that capital penalty juries are "not adequately instructed that persons convicted of special circumstances are truly not eligible for parole." As a result, he concludes, juries "falsely assume that the only means for society permanently to rid itself of dangerous murders is to sentence them to death." Implicit in this argument is the claim that the failure of the trial court to instruct the jury that a sentence of life without parole means just that violated due process.

At the outset, such an instruction was never requested by the defense, an omission that works a waiver of the point. Assuming, however, defendant is arguing that there was a sua sponte duty to so instruct the penalty jury, this court has repeatedly rejected that contention. In *People* v. *Bonin, supra*, 46 Cal.3d 659, for example, we rejected the need for such an instruction, noting that the phrase "life without possibility of parole" is used "in the common and nontechnical sense that the plain meaning of its words convey." (*Id.* at p. 698.) Thus, no instruction was necessary.

Similarly, in *People* v. *Thompson* (1988) 45 Cal.3d 86 [246 Cal.Rptr. 245, 753 P.2d 37], the defendant contended that it was error for the trial court not to instruct the jury that a death sentence would be carried out and a sentence of life with possibility of parole meant defendant would never be released from prison. But we found no error, pointing out that the proposed instruction "is not accurate," given the trial court's power of modification under Penal Code section 190.4, subdivision (e) and the Governor's powers of commutation. (45 Cal.3d at p. 130; see also *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 589 [286 Cal.Rptr. 628, 817 P.2d 893]; *People* v. *Clark* (1993) 5 Cal.4th 950, 1041 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1227 [270 Cal.Rptr. 451, 792 P.2d 251].)

Defendant also relies on *Simmons* v. *South Carolina* (1994) 512 U.S. __ [129 L.Ed.2d 133, 114 S.Ct. 2187] in which the high court held that, where the prosecution argued to the jury that defendant should be sentenced to death in view of his potential for future dangerousness, the trial court's failure to instruct the jury that defendant was not eligible for parole violated due process. (*Id.* at p. __ [129 L.Ed.2d at pp. 141-143].) The rationale supporting the result in *Simmons*, however, is not present here. The prosecution did not, in its closing penalty argument to the jury, argue the issue of defendant's future dangerousness as a factor favoring the death penalty. Moreover, the principal vice of the instruction given in *Simmons* was its

failure to indicate to the jury that "life imprisonment" meant defendant would be parole ineligible. (*Id.* at pp. __-__ [129 L.Ed.2d at pp. 143-144].) As the court's opinion noted, California is among nine jurisdictions in which capital juries *are* informed that their sentencing alternatives consist of death or life without parole. (*Id.* at p. __, fn. 7 [129 L.Ed.2d at pp. 144-145]; Pen. Code, § 190.3.) We therefore conclude that the instruction given did not deprive the penalty jury of "accurate information regarding [defendant's] parole ineligibility." (512 U.S. at p. __, fn. 7 [129 L.Ed.2d at pp. 144-145].)

CONCLUSION

The judgment is affirmed.

Lucas, C. J., Baxter, J., George, J., and Werdegar, J., concurred.

**KENNARD, J.**—I concur in the judgment and most of the reasoning of the majority. One issue, however—defendant's claim that his sentence of death is disproportionate to his level of culpability—is a closer question than the majority's rather summary treatment of it (maj. opn., *ante*, at pp. 961-962) would suggest, and therefore deserves additional comment.

Article I, section 17 of the California Constitution prohibits the state from imposing "[c]ruel or unusual punishment." Even if the statutorily authorized punishment for a criminal offense is not unconstitutional when viewed in the abstract, the sentence imposed on a defendant convicted of that offense may nonetheless be "cruel or unusual." (*People* v. *Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697].)

To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" (*ibid.*), or, stated another way, that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " (*People* v. *Cox* (1991) 53 Cal.3d 618, 690 [280 Cal.Rptr. 692, 809 P.2d 351]), the court must invalidate the sentence as unconstitutional.

In this case, defendant was sentenced to death for the murder of Esther Alvarado. But defendant played only a minor role in the murder: he did not kill Alvarado, nor did he assist in killing her. His sole involvement consisted of participating in a conversation that his girlfriend, Brenda Prado, had with the actual killer, Jesse Hernandez, in the course of which Hernandez agreed to kill Alvarado in exchange for drugs to be furnished by Prado. Even in that conversation, defendant did not play a leading role: he did not initiate the plan to kill Alvarado (the killing was suggested by Hernandez), and it was Prado, not defendant, who offered to give Hernandez drugs in exchange for killing Alvarado. In all likelihood, Alvarado would still have been murdered as planned, even if defendant had taken no part in the conversation in question.

Nevertheless, I agree with the majority that defendant's death sentence in this case should not be vacated. Although defendant's participation in the planned killing was not crucial, he willingly and actively supported the plan. Defendant endorsed Hernandez's proposal to kill Alvarado in exchange for drugs, and he offered Hernandez a gun to use as the murder weapon (Hernandez responded that he would use his own gun). Also, defendant was a part owner of the drugs that Prado used to pay Hernandez for Alvarado's murder, and he voiced no objection to their use for this purpose.

Moreover, to determine whether a given punishment is impermissibly disproportionate, we consider not only the nature of the offense and of the defendant's participation in that offense but also the nature of the offender, including the offender's "prior criminality." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) Here, defendant's involvement in Alvarado's murder was not an isolated incident in an otherwise law-abiding and nonviolent life. On the contrary, the prosecution introduced evidence that in the course of the drug-related feud that led to Alvarado's murder, defendant had "beaten up" Alvarado and that he had shot Prado's daughter (who was a close friend of Alvarado) in the abdomen because he believed that she, like Alvarado, had stolen drugs from him. In addition, defendant had a long history of violent conduct and was a convicted felon who had served time in prison. (See Pen. Code, § 190.3, factors (b) & (c) [prior violent conduct and prior felony convictions are aggravating circumstance supporting the death penalty]; Cal. Rules of Court, rule 421(b)(1)-(3) [prior violent conduct, prior convictions, and prior prison terms are aggravating circumstances supporting increased punishment in noncapital cases].)

Based on all of these facts, the punishment in this case is not "grossly disproportionate to the defendant's individual culpability" (*People* v. *Dillon,*

*supra*, 34 Cal.3d at p. 479), nor does it " ' "shock[] the conscience and offend[] fundamental notions of human dignity." ' " (*People* v. *Cox, supra,* 53 Cal.3d at p. 690.)

Mosk, J., concurred.

Appellant's petition for a rehearing was denied February 22, 1996, and the opinion was modified to read as printed above.